DuPONT GLORE FORGAN INCORPO-
RATED et al., Plaintiffs,

v.

AMERICAN TELEPHONE AND TELE-
GRAPH COMPANY et al., Defendants
and Third-Party Plaintiffs,

v.

UNITED STATES of America,
Third-Party Defendant.

No. 73 Civil 2447.

United States District Court,
S. D. New York.

July 19, 1977.

Nickerson, Kramer, Lowenstein, Nessen, Kamin & Soll, New York City, for plaintiffs; Eugene H. Nickerson, Robert M. Heller, Michael S. Oberman, Greg A. Danilow, Philip J. Hess, New York City, of counsel.

Davis, Polk & Wardwell, New York City, for defendants and third-party plaintiffs; Guy Miller Struve, Hiram D. Gordon, L. Gordon Harriss, Richard J. Cunningham, New York City, of counsel.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

### EDWARD WEINFELD, District Judge.

In this class action, plaintiffs seek to recover from the American Telephone and Telegraph Company ("AT&T") and twenty-three companies affiliated with it (the "operating companies") a portion of the federal communications excise taxes which defendants collected from plaintiffs and paid over to the United States Government. Plaintiffs claim that those taxes were collected by reason of a contract, combination or conspiracy among the defendants in restraint of interstate commerce, in violation of Section 1 of the Sherman Act,[1] and seek treble damages. Alternatively, plaintiffs contend that the defendants violated an alleged statutory duty under the Excise Tax Reduction Act of 1965[2] ("the Act"), and seek recovery of taxes paid as a proximate result of the defendants' alleged breach of duty.[3]

The case arises out of a provision of the Act which exempted from the excise tax generally imposed on local telephone service, "private communication service," such as intercommunication between different telephones in the subscriber's office, if a separate charge is made for such intercommunication.[4] The plaintiffs are users of Centrex systems, a form of business telephone service which permits both intercommunication and calls to and from the outside telephone network. The gist of their complaint is that the defendants failed to establish a separate charge for the intercommunication portion of Centrex between 1965 and 1971 or 1972, and that, as a result, the plaintiffs paid a greater amount of excise tax than they would have paid had such a separation of charges been made.[5]

---

1. 15 U.S.C. § 1. The statute reads in relevant part:

    Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . .

2. Pub. L. No. 89–44, § 302, 79 Stat. 136.

3. Plaintiffs originally asserted two other theories of liability. One claim, that the defendants attempted or conspired to monopolize the production and trade in PBX systems, see pp. 1107–1108 infra, in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, was withdrawn. A further claim that the entries on defendants' books and records were sufficient to constitute separate charges for exchange access and intercommunication, see pp. 1110–1111 infra, and that plaintiffs were therefore not required to pay the entire amount of the tax which was collected from them, was dismissed by the Court before trial, along with a third-party complaint filed by the defendants against the government. DuPont Glore Forgan Inc. v. American Tel. & Tel. Co., 428 F.Supp. 1297 (S.D.N.Y.1977). Familiarity is assumed with that opinion and with the Court's prior opinion certifying the plaintiff class. DuPont Glore Forgan Inc. v. American Tel. & Tel. Co., 69 F.R.D. 481 (S.D.N.Y.1975).

4. Internal Revenue Code of 1954, as amended, (hereinafter I.R.C.) §§ 4251(a), 4252(a), (d). See pp. 1110–1111 infra.

5. Jurisdiction is based upon § 4 of the Clayton Act, 15 U.S.C. § 15, and upon 28 U.S.C. §§ 1331 and 1337.

## I. FACTUAL BACKGROUND

### a. *The Parties*

The plaintiff class consists of all persons who were taxable [6] Centrex subscribers of one or more of the defendant operating companies at any time between January 1, 1966, the effective date of the Act, and the effective date in 1971 or 1972 of the operating companies' tariffs establishing a separate Centrex charge for intercommunication, and who did not request exclusion from the class. This includes over a thousand subscribers with over 1,400 Centrex locations.

Collectively the defendants, along with certain other subsidiaries of AT&T,[7] are sometimes referred to as the Bell System. The relationship among the various companies of the Bell System was described by one witness as a "federal system." Each of the operating companies is an independently organized, autonomous corporation managed by its own board of directors, providing local telephone service,[8] including Centrex service, in one or more states. Each operating company also connects with the facilities of other telephone companies, including non-Bell System companies and the Long Lines Department of AT&T, to provide long-distance calls to and from its service area. The local telephone service, including Centrex service, of each of the operating companies is subject to regulation under state laws intended to protect the public against excessive or unduly discriminatory rates.[9] Within its service area each operating company is the only company authorized under these laws to render Centrex service. These laws further require that the types of telephone service and the rates charged by each operating company be set forth in tariffs filed with the public utility commission in each state.[10] In general, no changes can be made in rates or service until an amendment to the tariff is filed with, and allowed to become effective by, the public utility commission.[11] Thus each of the operating companies, within its service areas, is a regulated monopolist.

Although the operating companies are independently organized, they are closely affiliated with each other and with AT&T. AT&T owns all of the capital stock of sixteen of the operating companies, at least 70% of the capital stock of five, and a substantial minority interest in the other two.[12] An AT&T officer sits on the board of directors of each of the operating compa-

---

**6.** Certain governmental, educational and charitable organizations are not subject to the telephone excise tax. *See* I.R.C. § 4253, as amended by the Tax Reform Act of 1976, Pub. L. No. 94–455, § 1904(a)(6), 90 Stat. 1520. During the period relevant to this lawsuit similar exemptions had been contained in I.R.C. §§ 4292–4294.

**7.** Western Electric Company, Inc., which manufactures and sells communications equipment, and Bell Telephone Laboratories, Inc. Until October 1966 AT&T owned 99.85% of the capital stock of Western Electric; since that time AT&T has owned 100% of its stock. The capital stock of Bell Laboratories is owned 50% by AT&T and 50% by Western Electric.

**8.** AT&T itself provides no local telephone service, but, through its Long Lines Department, furnishes interstate telephone service between points served by different operating companies.

**9.** This opinion will refer to the statutes regulating intrastate telephone service in six states—California, Florida, Illinois, Massachusetts, New York and Ohio—as examples; the statutes in other states are generally similar. Interstate telephone service is regulated by the Federal Communications Commission pursuant to Title II of the Federal Communications Act, 47 U.S.C. § 201 *et. seq.*

**10.** *E. g.,* Cal.Pub.Util.Code §§ 489, 532 (West 1975); Fla.Stat.Ann. §§ 364.04, 364.08 (West 1968); Ill.Rev.Stat. ch. 111⅔, §§ 35, 37 (1973); Mass.Ann.Laws ch. 159, § 19 (Michie/Law.Co-op.1970); N.Y.Pub.Serv.L. §§ 91, 92 (McKinney 1955 & Supp.1976); Ohio Rev.Code Ann. §§ 4905.30, 4905.32 (Page 1977).

**11.** *See, e. g.,* Cal.Pub.Util.Code § 454 (West 1975); Fla.Stat.Ann. § 364.05 (West 1968); Ill. Rev.Stat. ch. 111⅔, § 36 (1973); Mass.Ann. Laws, ch. 159, §§ 19, 20 (Michie/Law.Co-op. 1970 & Supp.1977); N.Y.Pub.Serv.L. § 92(2) (McKinney Supp.1976); Ohio Rev.Code Ann. §§ 4909.17, 4909.18 (Page 1977).

**12.** AT&T owns 26% of the capital stock of Cincinnati Bell, Inc., and 18% of the capital stock of Southern New England Telephone Company.

nies except one, and transfers of personnel between the operating companies and AT&T are common. The president of each of the operating companies is chosen with the concurrence of the chairman of the board of AT&T.

The operating companies are also affiliated with AT&T by virtue of license agreements. Under these agreements each operating company uses AT&T's patented telephone equipment within its service area. The license agreements obligate AT&T to engage in research and development and to provide technical advice and assistance to the operating companies in a wide range of matters. This assistance is rendered, for example, by responses to specific inquiries from the operating companies, by conferences involving personnel from all the operating companies and AT&T, and by memoranda and newsletters prepared by persons at AT&T and distributed throughout the Bell System. Through system-wide task forces and committees the operating companies often participate in preparing materials on which AT&T's recommendations are based. As a result, AT&T's advice is usually followed by the operating companies, with variations to account for local situations. Of particular relevance to this case is the fact that most of the operating companies generally relied on AT&T for information and advice relating to the federal excise tax.

b. *Characteristics of Telephone Service*

The nature of this case requires a fairly detailed description of some of the technical aspects of telephone service. Ordinary telephone service consists of the privilege of making calls within a local exchange area and, upon payment of an additional amount (message units or a toll charge), outside that area, plus the privilege of receiving telephone calls from any telephone within or outside the local exchange area. A subscriber receives access to the telephone network through a "line" or "loop" (usually consisting of a pair of wires) which is run from the telephone company central office to the subscriber's premises. At the subscriber's end, the line terminates in a "station," a broad term to describe the telephone instrument or other equipment used by the subscriber. When the subscriber makes a telephone call, switching equipment at the telephone company central office (or, in the case of long distance calls, at several telephone company offices) connects his line to the line of the called telephone, thereby completing the call. This ability to place calls through the telephone network is known as "exchange access."

A business or other organization which has a large number of personnel at one location generally will have more than one exchange access line and more than one station. Such a subscriber often finds that there are many calls between its own stations and desires a specific service for such intercommunication. Equipment for intercommunication can be leased or purchased from a non-Bell System company or provided by an operating telephone company. However, prior to 1968, the defendants' tariffs provided that non-Bell System equipment could not be connected with the telephone network.[13] Thus, a subscriber who obtained his intercommunication equipment from a competitor of one of the defendants required two telephone systems—one for exchange access and one for intercommunication.

(i) PBX Service

For many years prior to the introduction of Centrex service in 1961, the operating companies provided the capability of intercommunication among a subscriber's stations and exchange access through Private Branch Exchange ("PBX") service. The switching equipment for PBX service is generally located on the subscriber's premises. Each of the subscriber's stations is connected to this PBX switching equipment by a station line, and the switching equip-

13. *See* Use of the Carterfone Device in Message Toll Telephone Service, 13 F.C.C.2d 420, 421, 427 (1968).

ment is connected in turn to the telephone company central office by a number of "trunks," or pairs of wires (physically similar to the lines used for ordinary telephone service) which provide exchange access. However, since not all of a PBX subscriber's stations are likely to be making outside calls at once, a PBX subscriber generally has many fewer trunks than stations. In addition, one or more attendant positions such as switchboards or consoles are connected to the PBX switching equipment. A PBX subscriber generally pays a separate monthly charge for the service provided by each PBX station, each PBX trunk, each attendant position and the PBX switching equipment, as well as charges for any supplemental services furnished.

An incoming call to a PBX system arrives over one of the trunks connecting the PBX switching equipment to the telephone company central office, and rings at the attendant's position. After answering the phone and ascertaining which individual or extension the caller wishes, the attendant completes the call by establishing a connection between the trunk line on which the call is coming in and the desired station line. If a person wants to make an outgoing call from one of the PBX stations, his station line is connected through the PBX switching equipment—either manually by the attendant (as with incoming calls) or automatically—to one of the trunks connecting the PBX switching equipment to the telephone company central office. The call is then dialed and routed through the central office as with ordinary telephone service. If a person wants to call from one PBX station to another within the subscriber's system, the station lines are connected through the PBX switching equipment, either automatically or manually by the attendant.

In 1961, message unit and toll calls could not ordinarily be identified to the individual PBX station which made the call; rather, they were billed to the subscriber's PBX system as a whole. However, at that time

six of the defendant operating companies furnished PBX with identified outward dialing ("IOD"), which permits identification of the individual station making the outward toll call for the customer's administrative purposes. The only type of IOD available with PBX service in 1961 was Centralized Automatic Message Accounting ("CAMA"), in which outgoing calls are interrupted by an operator at a telephone company office, who asks the caller for the number he is calling from and records it for use in billing. However, certain more advanced types of switching equipment which did not become available for use with PBX until 1965 or thereafter are capable of identifying the calling station automatically, by a process known as automatic number identification ("ANI"). Both CAMA and ANI provided essentially the same service, that is, IOD.

Another service feature provided by some of the operating companies with their PBX service prior to 1961 was direct inward dialing ("DID"). DID enables persons outside the subscriber's PBX system to dial any PBX station within the system directly, bypassing the attendant station. Prior to 1961 twelve operating companies offered PBX with DID, including the same six who offered PBX with IOD.

(ii) Centrex Service

In 1961 the operating companies began to offer Centrex service, which is the subject of this litigation. Centrex service, like PBX service, provides the capability of intercommunication among the telephone stations within the subscriber's Centrex System, as well as exchange access.[14] While the precise nature of Centrex service varied among the operating companies, in broad outline it was similar throughout the Bell System. Centrex service can be provided using two different physical arrangements, known as Centrex-CU (for "Customer") and Centrex-CO (for "Company" or "Central

---

14. Not all Centrex stations could make or receive calls from the outside telephone network. Centrex stations that could only make or receive calls to or from other Centrex stations in the same Centrex system are called restricted Centrex stations. Unless otherwise indicated, all references in this opinion to "Centrex stations" refer to unrestricted Centrex stations.

Office"), depending on the location of the switching equipment. These two types of Centrex service are functionally similar. Each permits intercommunication and exchange access. In addition, each allows incoming calls to be dialed directly to an individual Centrex station (DID) and permits identification of the particular station making a message unit or toll call (IOD).

However, there are several differences between the equipment used in Centrex-CU and that used in Centrex-CO. Centrex-CU uses essentially the same equipment as PBX service with DID and IOD. Thus, the switching equipment is located on the customer's premises, and is connected to the central office by trunks. In Centrex-CO, on the other hand, all the switching equipment is located at the telephone company central office, and each Centrex station is connected to the central office by an individual line. Calls between Centrex stations, as well as outside calls, are routed through the central office. Second, ANI was initially available only with Centrex-CO, which used more advanced switching equipment; until ANI became available with the PBX switching equipment used in Centrex-CU after 1965, Centrex-CU could provide IOD only through an operator, by means of the CAMA system described above. However, despite these differences between Centrex-CU and Centrex-CO, the overall service provided by each was essentially similar.

Like the technical aspects of Centrex service, the Centrex rate structure varied somewhat from jurisdiction to jurisdiction, but there were broad areas of similarity among all the operating companies. Whereas PBX rates are based upon a separate monthly charge for the service provided by each individual piece of equipment, the operating companies' Centrex tariffs established a "package" rate, including the cost of all the facilities and equipment required. Thus during the period relevant to this litigation, from 1961 to 1971 or 1972, a Centrex subscriber paid a single monthly charge for each Centrex station and attendant position, which covered both exchange access and intercommunication, rather than separate monthly charges for the various pieces of equipment used. Moreover, although the costs of providing Centrex-CO and Centrex-CU differ because of the different equipment used, Centrex service had a single composite rate regardless of serving method, based on an average of the costs of Centrex-CO and Centrex-CU. The only difference was that the rates for Centrex-CO were slightly higher to reflect the floor space and power provided by the telephone company for the switching equipment which was located on its premises, rather than on the subscriber's as in the case of Centrex-CU. Finally, a Centrex subscriber did not generally have a choice of whether he would receive Centrex-CO or Centrex-CU because Centrex service was a single offering. The tariffs of most of the operating companies reserved to the company the right to determine which type of equipment would be used in each case. Even when the tariff did not explicitly so provide, the company generally made the decision itself based upon considerations of which type of service could be provided more economically.

c. *The Federal Communications Excise Tax*

From 1917 to 1924[15] and from 1932 to date,[16] telephone and other communications services have been subject to a federal excise tax. This tax is imposed upon the person paying for the telephone service, but the company providing the service is required to collect the tax from its subscribers and remit it to the government.[17] In

---

15. War Revenue Act of 1917, ch. 63, § 500(e), 40 Stat. 300; Revenue Act of 1918, ch. 18, § 500(f), 40 Stat. 1057 (1919); Revenue Act of 1921, ch. 136, § 500, 42 Stat. 227.

16. Revenue Act of 1932, ch. 209, § 701, 47 Stat. 169; Internal Revenue Code of 1939, § 3465; I.R.C. § 4251.

17. I.R.C. §§ 4251(a)(1), 4291, 7501; *see generally DuPont Glore Forgan Inc. v. American Tel. & Tel. Co.*, 428 F.Supp. 1297 (S.D.N.Y.1977).

1961, when the operating companies began to offer Centrex service, a tax of 10% was imposed on the amounts paid for "general telephone service." Essentially "general telephone service" included any kind of local telephone service which permitted exchange access, i. e., which permitted the subscriber to complete a call through a local exchange.[18] The statute specifically prescribed that PBX service was "general telephone service."[19] In addition, since Centrex service permitted local exchange access, it too was taxable as "general telephone service." However, since the defendants' tariffs at that time prohibited intercommunication equipment furnished by a non-Bell System company from being connected to the telephone network,[20] such equipment was not capable of providing exchange access and was not taxed, since it did not fall within the definition of "general telephone service." This created a competitive disadvantage for the defendants' PBX and Centrex services, since they were taxed while their competition was not.

The Act substantially restructured the provisions of the communications excise tax, in part "to make it clear that it is the service as such which is being taxed and not merely the equipment being supplied."[21] To ameliorate the defendants' competitive disadvantage, the Act exempted from the tax, as of January 1, 1966, "private communication service," defined in relevant part as:

> communication service furnished to a subscriber which entitles the subscriber . . . to the use of an intercommunication system for the subscriber's stations, *regardless of whether such . . intercommunication system may be connected through switching with [a local telephone exchange.]*[22]

The congressional committee reports noted that this provision was added to remove the defendants' "severe competitive handicap" in furnishing intercommunication systems.[23]

However, the Act further provided that intercommunication service was not tax-exempt "unless a separate charge is made for such service."[24] Because the defendants' PBX rates were based upon a charge for each individual piece of equipment used, a "separate charge" could be identified for those portions of a PBX system devoted to intercommunication, such as the PBX switching equipment, and those devoted to exchange access, such as the trunks. Amounts paid by a PBX subscriber for the former items were therefore exempt from the tax. However, since Centrex was billed on a "package rate" basis, covering the entire cost of service in one charge, there was no separate charge for intercommunication distinct from that for exchange access, and thus the entire amount paid by a

---

18. Excise Tax Technical Charges Act of 1958, P.L. 85–859, § 133(a), 72 Stat. 1275. General telephone service did not include telephone services for which a toll charge was paid, such as long distance calls, but such "toll telephone service" was taxed separately at the same rate of 10%. *Id.*

19. *Id.*

20. *See* p. 1107 *supra.*

21. H.R.Rep.No.433, 89th Cong., 1st Sess. 30 (1965), *reprinted in* [1965] U.S.Code Cong. & Admin.News, pp. 1645, 1676; S.Rep.No.324, 89th Cong., 1st Sess. 35 (1965), *reprinted in* [1965] U.S.Code Cong. & Admin.News pp. 1690, 1725. These reports will hereinafter be referred to as "H.Rep." and "S.Rep.," respectively, and cited only to pages in U.S.Code Cong. & Admin.News.

The Act eliminated the definition of "general telephone service," and made "local telephone service" taxable. "Local telephone service" was defined as

> (1) the access to a local telephone system, and the privilege of telephonic quality communication with substantially all persons having telephone or radio telephone stations constituting a part of such local telephone system, and (2) any facility or service provided in connection with a service described in paragraph (1). I.R.C. § 4252(a).

"Private communication service," as defined hereinafter, and toll telephone service, which included long distance calls and Wide Area Telephone Service (WATS), were excluded from "local telephone service" but were taxed at the same rate. I.R.C. § 4251.

22. I.R.C. § 4252(d) (emphasis supplied).

23. H.Rep. at 1677; S.Rep. at 1726.

24. I.R.C. § 4252(d).

subscriber for Centrex service was taxable even after passage of the Act.[25] This was recognized in the congressional committee reports:

> It is understood that . . . PBX systems generally will immediately qualify for this exemption. However, it is understood that Centrex systems—where the switching equipment is generally on the premises of the local exchange rather than on that of the subscriber—generally do not, as yet, provide for a charge which is separate and distinct from that for local telephone service. Until such a separation is made, this exemption, therefore, will not apply in the case of Centrex service.[26]

In passing the Act, Congress contemplated a gradual reduction and eventual elimination of the telephone excise tax. Thus the tax was to be reduced from 10% to 3% on January 1, 1966, with subsequent annual reductions of 1% until it was eliminated entirely. However, shortly after the reduction to 3% took effect it was rescinded. Between 1966 and 1970 the reduction and elimination of the tax was postponed several times because of the government's need for revenue during the Vietnam War.[27] Finally, in 1970, Congress provided that the excise tax would remain at 10% through 1972, and then over a ten-year period would be reduced 1% each year until its ultimate elimination on January 1, 1982.[28] Until 1971 the tariffs of all the operating companies continued to contain a package rate for Centrex service. Thus during that period the members of the plaintiff class were taxed on the entire amount they paid for Centrex service at the rate of 10%, while PBX customers and persons who obtained intercommunication systems from non-Bell System companies were taxed only on the amounts they paid for exchange access, and not on the amounts they paid for intercommunication. It was not until 1971 or 1972 that the various operating companies filed revised tariffs establishing separate charges for exchange access and for intercommunication.

Against this extensive factual background the Court considers the plaintiffs' claims.

## II. SHERMAN ACT CLAIM

### a. Legal Standard

Plaintiffs contend that defendants' failure to effect a separation of charges for exchange access and intercommunication until 1971 or 1972 was the result of a conspiracy or combination in violation of Section 1 of the Sherman Act. To sustain this claim, plaintiffs must prove by a fair preponderance of the evidence two essential elements: first, that the defendants entered into a "contract, combination . . . or conspiracy," and second, that such contract, combination or conspiracy was "in restraint of trade or commerce among the several States."[29] As to the first element, plaintiffs must prove that the defendants engaged in some form of concerted action, since independent, unilateral action does

---

25. Restricted Centrex stations, which did not provide exchange access, see n. 14 supra, were thus not taxable under the Act.

26. H.Rep. at 1677; S.Rep. at 1726. As described supra p. 1109, the Centrex switching equipment is located on the telephone company's premises only in the case of Centrex-CO. However, neither Centrex-CU nor Centrex-CO had a separate charge for intercommunication.

27. See n. 62 infra.

28. Excise, Estate, and Gift Tax Adjustment Act of 1970, P.L. 91–614, § 201(b), 84 Stat. 1836. Pursuant to this law the excise tax is now 5%.

29. 15 U.S.C. § 1. See House of Materials, Inc. v. Simplicity Pattern Co., 298 F.2d 867, 870 (2d Cir. 1962); American Tel. & Tel. Co. v. Delta Communications, Inc., 408 F.Supp. 1075, 1088 (S.D.Miss.1976); Overseas Motors, Inc. v. Import Motors Ltd., 375 F.Supp. 499, 531 (E.D. Mich.1974), aff'd, 519 F.2d 119 (6th Cir.), cert. denied, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975); Beckman v. Walter Kidde & Co., 316 F.Supp. 1321, 1324 (E.D.N.Y.1970), aff'd, 451 F.2d 593 (2d Cir. 1971), cert. denied, 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1972); Carbon Steel Prods. Corp. v. Alan Wood Steel Co., 289 F.Supp. 584, 587 (S.D.N.Y.1968); cf. Sum of Squares, Inc. v. Market Research Corp. of America, 401 F.Supp. 53 (S.D.N.Y.1975).

not violate Section 1 of the Sherman Act.[30] Plaintiffs must show that the defendants "had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement." [31] However, a finding of actual explicit agreement is not necessary. "Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce," suffices; [32] so, too, a "silent combination or understanding" may be sufficient.[33] Moreover, it is hornbook law that conspiracies are rarely proved by direct evidence; an inference of conspiracy can be drawn from the acts and conduct of the alleged conspirators.[34] Con-

sciously parallel behavior among defendants may be considered as circumstantial evidence that they acted in concert; however, by itself, without more, it is insufficient to sustain an inference of concert of action.[35] Since consciously parallel behavior may logically result, without any agreement, from the fact that the same behavior is in the independent competitive interest of each defendant, to support an inference of conspiracy there must also be some independent facts, such as that the action taken was interdependent and against the apparent individual economic interest of each defendant absent an agreement.[36]

Second, the plaintiffs must establish that the defendants' contract, combination or

**30.** *FLM Collision Parts, Inc. v. Ford Motor Co.,* 543 F.2d 1019, 1029 (2d Cir. 1976), *cert. denied,* 429 U.S. 1097, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977); *Hanson v. Shell Oil Co.,* 541 F.2d 1352, 1359 (9th Cir. 1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977); *Michelman v. Clark-Schwebel Fiber Glass Corp.,* 534 F.2d 1036, 1042 (2d Cir.), *cert. denied,* 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976); *Modern Home Inst., Inc. v. Hartford Acc. & Indem. Co.,* 513 F.2d 102, 108–09 (2d Cir. 1975); *Overseas Motors, Inc. v. Import Motors, Ltd.,* 375 F.Supp. 499, 531 (E.D.Mich.1974), *aff'd,* 519 F.2d 119 (6th Cir.), *cert. denied,* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975).

**31.** *American Tobacco Co. v. United States,* 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946); *accord, Michelman v. Clark-Schwebel Fiber Glass Corp.,* 534 F.2d 1036, 1043 (2d Cir.), *cert. denied,* 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976); *see United States v. Standard Oil Co.,* 316 F.2d 884, 890 (7th Cir. 1963) ("consciousness of commitment to a common scheme").

**32.** *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 227, 59 S.Ct. 467, 474, 83 L.Ed. 610 (1939); *accord, United States v. Masonite Corp.,* 316 U.S. 265, 275, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942); *see also Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.,* 394 U.S. 700, 704, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969); *American Tobacco Co. v. United States,* 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed.2d 1575 (1946).

**33.** *United States v. Arnold, Schwinn & Co.,* 388 U.S. 365, 382, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).

**34.** *Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.,* 394 U.S. 700, 704, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969); *United States v. Parke, Davis & Co.,* 362 U.S. 29, 44, 80 S.Ct.

503, 4 L.Ed.2d 505 (1960); *Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.,* 346 U.S. 537, 540–41, 74 S.Ct. 257, 98 L.Ed. 273 (1954); *American Tobacco Co. v. United States,* 328 U.S. 781, 809–10, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 221, 59 S.Ct. 467, 83 L.Ed. 610 (1939); *Eastern States Retail Lumber Dealers' Ass'n v. United States,* 234 U.S. 600, 612, 34 S.Ct. 951, 58 L.Ed. 1490 (1914); *Michelman v. Clark-Schwebel Fiber Glass Corp.,* 534 F.2d 1036, 1043 (2d Cir.), *cert. denied,* 429 U.S. 885, 97 S.Ct. 236, 50 L.Ed.2d 166 (1976); *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338, 1345 (3d Cir. 1975).

**35.** *Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.,* 346 U.S. 537, 540–41, 74 S.Ct. 257, 98 L.Ed. 273 (1954); *Modern Home Inst., Inc. v. Hartford Acc. & Indem. Co.,* 513 F.2d 102, 110 (2d Cir. 1975); *Kreager v. General Elec. Co.,* 497 F.2d 468, 471 (2d Cir.), *cert. denied,* 419 U.S. 861, 95 S.Ct. 111, 42 L.Ed.2d 95 (1974); *Bogosian v. Gulf Oil Corp.,* 393 F.Supp. 1046, 1048–52 (E.D.Pa.1975).

**36.** *Modern Home Inst., Inc. v. Hartford Acc. & Indem. Co.,* 513 F.2d 102, 110–11 (2d Cir. 1975); *Bendix Corp. v. Balax, Inc.,* 471 F.2d 149, 160 (7th Cir. 1972), *cert. denied,* 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973); *Harlem River Consumers Coop., Inc. v. Associated Grocers of Harlem, Inc.,* 408 F.Supp. 1251, 1278 (S.D.N.Y. 1976); *American Tel. & Tel. Co. v. Delta Communications Corp.,* 408 F.Supp. 1075, 1088 (S.D.Miss.1976); *Independent Iron Works, Inc. v. United States Steel Corp.,* 177 F.Supp. 743, 746–47 (N.D.Cal.1959), *aff'd,* 322 F.2d 656 (9th Cir.), *cert. denied,* 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963); *see First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 287–88, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

conspiracy constituted a forbidden restraint of trade. Because of the potentially vast scope of a prohibition of all agreements which restrain trade in any manner, a so-called "rule of reason" has been adopted which proscribes only unreasonable restraints of trade.[37] Some activities, however, are so perniciously anticompetitive that they are conclusively presumed to be unreasonable and are declared illegal per se. These include price fixing among competitors,[38] division of markets,[39] resale price maintenance,[40] and group boycotts.[41] Combinations which do not fall within one of the per se classifications must be carefully scrutinized to see if they are reasonable in the light of all the surrounding facts and circumstances.[42]

b. *Contentions of the Parties*

Plaintiffs' antitrust claim centers about allegations that the defendants entered into two different but closely related agreements in which the defendants were under the direction and domination of AT&T. First, plaintiffs charge that in 1961 or thereafter the defendants entered into an express or implied agreement to maintain a uniform rate structure for Centrex service, including (a) a package charge for each Centrex station without a separate charge for the use of each item of basic equipment; (b) a single Centrex offering treated essentially the same for rate purposes regardless

of the type of switching equipment used to provide the service and regardless of the location of the switching equipment; and (c) the reservation to the operating company, rather than to the customer, of the choice of Centrex-CU or Centrex-CO. Plaintiffs contend that this agreement is evidenced by "instructions" about Centrex service and rates sent by AT&T to each of the operating companies in 1961, by meetings, attended by representatives of the operating companies, and correspondence in which AT&T urged the operating companies to follow its "instructions," and by the fact that the Centrex tariffs filed by the operating companies followed the AT&T instructions in all important respects, differing only in "irrelevant and minor" details.

According to the plaintiffs, this agreement was motivated by the Bell System's desire to increase its profits. By 1961 the companies of the Bell System collectively had an investment of more than $600,000,000 in PBX switching equipment. Plaintiffs assert that this investment was threatened by the development of more advanced switching equipment. Thus, plaintiffs claim that one purpose of making Centrex a single offering and reserving to the operating company the right to choose which customers would receive Centrex-CO (which used the new equipment) and Centrex-CU (which used the old), was to protect the

37. *Continental T.V., Inc. v. GTE Sylvania, Inc.,* —— U.S. ——, ——, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *United States v. Topco Assocs., Inc.,* 405 U.S. 596, 606–07, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *Northern Pac. Ry. v. United States,* 356 U.S. 1, 4–5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *Apex Hosiery Co. v. Leader,* 310 U.S. 469, 490–501, 60 S.Ct. 982, 84 L.Ed. 1311 (1940); *Standard Oil Co. v. United States,* 221 U.S. 1, 60, 62, 31 S.Ct. 502, 55 L.Ed. 619 (1911).

38. *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *United States v. Trenton Potteries Co.,* 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700 (1927).

39. *United States v. Topco Assocs., Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *Addyston Pipe & Steel Co. v. United States,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899).

40. *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951).

41. *Klor's, Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originators' Guild of America, Inc. v. FTC,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941).

42. *See Continental T.V., Inc. v. GTE Sylvania, Inc.,* —— U.S. ——, ——, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *United States v. Topco Assocs., Inc.,* 405 U.S. 596, 607, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *White Motor Co. v. United States,* 372 U.S. 253, 261–63, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); *United States v. Columbia Steel Corp.,* 334 U.S. 495, 527–28, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948); *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

value of this investment by allowing each operating company to use the older equipment whenever it was profitable to do so. A second alleged motive for the conspiracy was that the defendants were dissatisfied with their earnings on PBX service and sought, by using old PBX equipment under the name of Centrex and charging for it at higher rates, to improve their earnings on that equipment without having to apply for a rate increase.[43] The package rate and single Centrex offering allegedly furthered this goal by focusing attention on the service rather than on the equipment and thus concealing the increased earnings from subscribers and regulatory authorities.

The second aspect of plaintiffs' antitrust claim is an alleged agreement among the defendants, at or about the time of the passage of the Act in 1965, to continue to maintain the package rate for Centrex service and not to separate Centrex rates into charges for exchange access and intercommunication. Plaintiffs contend that the evidence shows that AT&T decided that "defendants' interests would not be advanced by a separation of Centrex charges," because if new Centrex tariffs were filed, customers and regulatory commissions might attack Centrex rates as excessive and discriminatory. Defendants allegedly feared that their tariffs would be found excessive because their earnings on Centrex service were substantially higher than on PBX service. The claim of discrimination is based on a contention that, although Centrex-CO allegedly cost the operating companies more to provide than Centrex-CU, and Centrex-CO was allegedly more desirable to the subscriber than Centrex-CU, the costs of the two services were averaged and the subscriber paid a single rate with no choice between the two services. Thus the charge is that Centrex-CU subscribers in effect subsidized Centrex-CO subscribers and received a less desirable service for the same price.

Plaintiffs contend that to implement this decision AT&T instructed the operating companies in 1964 and thereafter that separate charges should not be established. They further contend that, despite the fact that it would have been in the independent economic interest of each operating company to establish separate charges since that would have facilitated the marketing of Centrex by lessening the excise tax for its customers, the operating companies followed AT&T's instructions and no company established separate charges until 1971. Separate charges were not established, according to plaintiffs, until AT&T decided that the threat of competition from non-Bell System suppliers of intercommunications systems had increased so that the competitors' tax advantage had to be removed; each operating company then separated its charges by a method plaintiffs contend was approved by AT&T.

Plaintiffs contend that the alleged agreements "deprived customers of the benefit of independent pricing decisions" by the operating companies and therefore constituted a price fixing conspiracy which is per se illegal under Section 1 of the Sherman Act. Even if the conspiracy is not held to be per se illegal, plaintiffs claim that it should nonetheless be found in violation of the so-called "rule of reason." Plaintiffs argue that the defendants' alleged agreement had the effect of increasing the price paid by Centrex subscribers by the amount of the excise tax on the intercommunication portion of Centrex.

The defendants deny plaintiffs' charges entirely. They deny that any agreement, express or implied, was reached among them with respect to the filing of Centrex rates, the failure to establish separate charges after 1965, or the ultimate filing of revised tariffs in 1971. They claim that AT&T did no more than make recommendations and give advice and assistance with respect to Centrex rates, and that each operating company was an independent en-

---

**43.** In general, a new service such as Centrex in 1961 is initiated merely by the filing of tariffs, but when a rate increase on existing service is sought, hearings and more extensive regulatory review are common.

tity free to accept or reject AT&T's recommendations, and which made its own decisions with respect to its own Centrex rates. They admit that in making these decisions the operating companies considered the advice and recommendations of AT&T given pursuant to the license contract, but deny that this normal working relationship had a sinister purpose. They contend that the Centrex tariffs of the operating companies in fact differed in many respects from each other and from AT&T's recommendations. Moreover, they contend that even if there was an agreement among them it did not restrain trade, and that each operating company had valid independent business reasons for adopting the Centrex rate structure described above and for not establishing separate charges for exchange access and intercommunication until after 1971.

■ The defendants also make two claims of antitrust immunity which must be dealt with preliminarily. First, the defendants claim that, since each of the operating companies is a subsidiary, wholly or partly owned, of AT&T, they cannot be liable for an antitrust violation because "agreements as to prices between affiliated corporations do not violate Section 1 of the Sherman Act." As a broad principle of law this must be rejected. The Supreme Court has said in no uncertain terms that "common ownership or control of the contracting corporations does not liberate them from the impact of the antitrust laws."[44] The issue of whether, in a given case, affiliated corporations have conspired in violation of the Sherman Act is composed of two separate but related inquiries corresponding to the two elements of a Sherman Act claim. The first is whether the defendants are legally separate entities capable of conspiring or whether they constitute, in effect, a single business unit.[45] In this case it is clear that the defendants are organized and operated independently of one another, and do not in any way constitute a single business unit. Indeed defendants press this very point in opposing plaintiffs' claim that an agreement was reached. Thus there is no doubt that the defendants in this case are legally capable of conspiring.[46] The second issue, assuming that a contract, combination or conspiracy is found, is whether the particular combination constitutes a restraint of trade. In some cases an agreement among affiliated corporations is held not to restrain trade because, for example, it merely effects an internal redistribution of corporate profits or because there was no competition between the defendants to be restrained.[47] However, corporate affiliation

**44.** *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 598, 71 S.Ct. 971, 974, 95 L.Ed. 1199 (1951). *See United States v. Citizens & Southern Nat'l Bank,* 422 U.S. 86, 116–17, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975); *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 141–42, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 215, 71 S.Ct. 259, 95 L.Ed. 219 (1951); *United States v. Yellow Cab Co.,* 332 U.S. 218, 227, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); *Brager & Co. v. Leumi Securities Corp.,* 429 F.Supp. 1341, 1345 (S.D. N.Y.1977).

**45.** *See Knutson v. Daily Review, Inc.,* 548 F.2d 795, 801–02 (9th Cir. 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977); *George R. Whitten, Jr., Inc. v. Paddock Pool Bldrs., Inc.,* 508 F.2d 547, 557 (1st Cir. 1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975); *Battle v. Liberty Nat'l Life Ins. Co.,* 493 F.2d 39, 44 (5th Cir. 1974), *cert. denied,* 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975); *Sulmeyer v. Seven-Up Co.,* 411 F.Supp. 635, 639 (S.D.N.Y.1976); *I. Haas Trucking Corp. v. New York Fruit Auction Corp.,* 364 F.Supp. 868, 873 (S.D.N.Y.1973); *cf. Beckman v. Walter Kidde & Co.,* 316 F.Supp. 1321, 1325–26 (E.D.N.Y.1970), *aff'd,* 451 F.2d 593 (2d Cir. 1971), *cert. denied,* 408 U.S. 922, 92 S.Ct. 2488, 33 L.Ed.2d 333 (1972).

**46.** *Cf. TV Signal Co. of Aberdeen v. American Tel. & Tel. Co.,* 462 F.2d 1256, 1260 (8th Cir. 1972); *Chastain v. American Tel. & Tel. Co.,* 401 F.Supp. 151, 159–60 (D.D.C.1975). *But cf. Triebwasser & Katz v. American Tel. & Tel. Co.,* 535 F.2d 1356, 1358 n. 1 (2d Cir. 1976). In particular, it should be noted that AT&T owns less than 50% of the stock of two of the operating companies, *see* p. 1106 *supra,* which might suffice to establish their independence by itself.

**47.** *See Syracuse Broadcasting Corp. v. Newhouse,* 319 F.2d 683, 687–88 (2d Cir. 1963); *Call Carl, Inc. v. BP Oil Corp.,* 403 F.Supp. 568, 572–73 (D.Md.1975); Report of the Attorney General's National Committee to Study the Antitrust Laws 34–35 (1955); *cf. United States v. Citizens & Southern Nat'l Bank,* 422 U.S. 86, 113–14, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975).

is only one facet of the broad question of restraint of trade.[48] Thus, by itself, corporate affiliation confers no immunity upon these defendants.

■ Similarly, defendants claim that "agreements as to prices between noncompeting sellers" do not violate the Sherman Act and that, since the defendants each serve an exclusive territory and do not compete with each other in furnishing telephone service, they cannot be liable under the Sherman Act even if they conspired to fix their Centrex rates. Plaintiffs dispute the factual premise for this argument, claiming that they have shown that the defendants are in fact competitors because their "pricing decisions, if made independently, would have had some impact on each other."[49] Even assuming that the operating companies do not compete, however, defendants' position is not well taken. An agreement among noncompetitors can constitute an unreasonable restraint of trade in appropriate circumstances.[50] The extent of competition, if any, among the defendants, like their corporate affiliation, is but one factor in determining whether the alleged agreement is in restraint of trade.

### c. The History of Centrex Rates

The events surrounding the introduction of Centrex service in 1961, the passage of the Act in 1965 and the defendants' actions thereafter, and the ultimate filing of revised Centrex tariffs in 1971 and 1972, present factual issues that concern in large part the reasons why certain corporate actions were taken. The plaintiffs view the

defendants as a monolithic entity, often referring to "AT&T's decision" or "AT&T's reasons." This disregards the nature of the relationship between AT&T and its affiliates, and obscures the essential fact that the relevant decisions within AT&T and the operating companies were made by individuals. The purpose of corporate actions must be determined in the light of what each individual acting within the scope of his authority on behalf of the corporation knew and considered in exercising his judgment upon which such corporate action was taken, not by what other persons in other departments or other corporations who were without authority or responsibility for those decisions might have known.[51]

In late 1960 a Bell System-wide Task Committee was formed, consisting of rate-making executives from several of the operating companies chosen for their expertise in relevant areas, and representatives of various divisions of AT&T, including Operating, Engineering and Marketing. After several months of work this committee developed "basic principles and procedures which it would seem feasible for all Companies to follow in establishing rate treatment for Centrex Service." Materials embodying these principles, including a letter signed by an Assistant Vice President of AT&T and comprehensive technical binders, were sent to each of the operating companies by AT&T on April 28, 1961; the principles were further discussed at a meeting of rate-making personnel from each operating company and from AT&T on May 17 and 18, 1961.[52]

**48.** See Battle v. Liberty Nat'l Life Ins. Co., 493 F.2d 39, 44 (5th Cir. 1974), cert. denied, 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975); TV Signal Co. of Aberdeen v. American Tel. & Tel. Co., 462 F.2d 1256, 1260 (8th Cir. 1972); Brager & Co. v. Leumi Securities Corp., 429 F.Supp. 1341, 1345 (S.D.N.Y.1977); cf. cases cited n. 42 supra.

**49.** See p. 1130 infra.

**50.** See, e. g., Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 142, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968); Albrecht v. Herald Co., 390 U.S. 145, 150 n. 6, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); Cromar Co. v. Nuclear

Materials & Equip. Corp., 543 F.2d 501, 511–12 (3d Cir. 1976). The cases cited by defendants, see n. 90 infra, hold merely that, on the facts of those cases, an agreement among noncompetitors should not be held per se illegal as price fixing.

**51.** Cf. Woodmont, Inc. v. Daniels, 274 F.2d 132, 137 (10th Cir. 1959), cert. denied, 362 U.S. 968, 80 S.Ct. 955, 4 L.Ed.2d 900 (1960).

**52.** At trial the plaintiffs offered into evidence three documents which appear to be notes taken of the meetings of May 17 and 18, 1961, and similar documents relating to the meetings of October 1965, see p. 1119 infra. The defend-

These recommendations summarized the basic features of Centrex service in the following language:

—Equivalent of conventional PBX service

PLUS

—Direct in-dialing to stations

—Station identification on outward toll traffic

—Transfer of incoming calls from one station to another

—Intercept—machine or attendant

—Night connections [53]

The principal rate objectives of the recommendations were to promote high development of Centrex service, so that it would ultimately become the standard for business subscribers; [54] to yield an adequate rate of return on the equipment used, and in particular to improve company earnings on PBX facilities, since PBX rates had not, according to the recommendations, kept pace with costs; to be competitive with non-Bell System telephone systems; to "[f]oster Systemwide uniformity of rate approach within all practicable limits"; and to relate Centrex rates to the rates for exist-

ing services to which it was similar, including individual business lines and PBX service. It was expected that Centrex rates would be somewhat higher than PBX rates but somewhat lower than individual business line rates.

The proposed Centrex rate structure was designed to promote these ends. Although Centrex could be provided with two different types of equipment, and despite the acknowledged differences in cost and facilities between these two types of service,[55] it was recommended that Centrex be treated as a single offering, giving the operating company as much flexibility as possible in choosing whether to offer Centrex-CU or Centrex-CO to a particular subscriber. In this way the company could choose whichever service would be most economical in the case of a given customer. For example, a subscriber who had PBX equipment on his premises already, or who was located so far from the telephone company's central office that the costs of the individual lines used for each Centrex-CO station would be very great, would be likely to receive Centrex-CU. This approach would maximize reve-

---

ants objected that these documents were inadmissible hearsay. However, the parties stipulated in the pretrial order that each such document was "prepared or caused to be prepared" by an employee of one of the operating companies who attended the meetings, and that each was "directed to or concerned with matters within the scope of employment" of the person who prepared the document. Thus, as to the operating company which employed the person preparing it, each document is admissible within the terms of Rule 801(d)(2)(D), Fed.R.Evid. Cf. *United States v. Miller*, 246 F.2d 486, 490 (2d Cir.), cert. denied, 355 U.S. 905, 78 S.Ct. 332, 2 L.Ed.2d 261 (1957); *United States v. S. B. Penick & Co.*, 136 F.2d 413, 416 (2d Cir. 1943). Moreover, at the close of the plaintiffs' case the Court ruled that the independent nonhearsay evidence adduced by plaintiffs was sufficient, under *United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969), cert. denied sub nom., *Lynch v. United States*, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970), to allow consideration of the hearsay evidence as to all alleged conspirators.

However, the fact that these documents are admissible does not mean that they are entitled to any substantial weight. As the Court stated at the time the exhibits were received, it is apparent upon their face that the documents

embody "a man's impressions, what he recorded at the time, expressing his own opinion or what he believed he heard." In many cases the notes are fragmentary and unclear in meaning. Moreover some of the persons who prepared the documents are unidentified.

53. "Direct in-dialing" and "[s]tation identification" are, respectively, DID and IOD. "Intercept" refers to a service in which calls dialed to unassigned numbers may be routed to an attendant or to a recorded announcement. "Night connections" allow calls coming in to the attendant position to be answered even after the attendant has left. "Transfer" is self-explanatory.

54. The defendants wanted Centrex to become a standard offering because it promised to offer significant savings over PBX service. Operator time would be reduced because the capability for DID and IOD meant that there would be more calls dialed directly, more station-to-station calls, and fewer "time and charges" calls. Moreover, each call was likely to require less circuit time since it could be dialed directly to the extension rather than through a switchboard.

55. *See* pp. 1108–1109 *supra*.

nues and enable the operating companies to offer somewhat lower Centrex rates than if each customer had the choice of whichever type of Centrex service he preferred. Moreover the "single offering" concept prevented premature retirement and replacement of PBX equipment, with a potential for increased rates, by utilizing that equipment (as Centrex-CU) whenever it was economically feasible to do so. In addition to the recommendation that Centrex be provided as a single offering, it was recommended that Centrex rates be the same whether Centrex-CU or Centrex-CO was offered,[56] to remove any economic incentive a subscriber might have to choose one service or the other and because Centrex-CU and Centrex-CO provided basically similar service.

It was also recommended that Centrex be provided with a package rate, including all costs of service in a single charge per Centrex station, primarily to make Centrex a simple and readily understandable service. The PBX rate structure, based upon the individual pieces of equipment used by each subscriber, was somewhat difficult for subscribers to comprehend since many of them were not familiar with the technical aspects of telephone service. A single monthly charge based on the number of stations and attendant positions—items clearly visible to the subscriber and directly related to his communications needs—was much easier to apply and explain to subscribers than the more complex PBX rates. Moreover, in order to quote a rate for PBX service to a potential PBX subscriber, a detailed engineering study had to be made to estimate what equipment would be necessary to provide him adequate service; if the customer thereafter decided the cost was too high, the engineering study was wasted. Furthermore, in the case of Centrex-CO there was no feasible alternative to a package rate since the individual trunks and items of switching equipment used in PBX service did not exist as identifiable items dedicated to a single subscriber. A package rate for Centrex-CU as well was thus desirable to

minimize the differences between the two types of service and enhance the "single offering" concept.

Finally, the Centrex rate materials sent to the operating companies emphasized that system-wide uniformity of rate treatment was highly desirable. The recommendations recognized that the conditions faced by each company, including such factors as the cost of service, the available equipment and customer needs, varied widely, and that each company would have to develop its own rates based on these local conditions. However, the recommendations set forth detailed suggestions for developing Centrex rates and an example of a Centrex rate schedule for illustrative purposes. It was suggested that the operating companies should try to follow the proposed rate treatment as closely as possible. The reason for this was that Centrex customers often had installations in more than one state, and it was felt that these companies would find it easier to understand Centrex and would be less likely to complain if the rate treatment were similar in each jurisdiction.

Tariffs generally embodying these recommendations were filed by most of the operating companies in the next several years. In late 1964, when AT&T was lobbying for a total or partial repeal of the communications excise tax—the lobbying effort that preceded the passage of the communications excise tax portions of the Act—AT&T employees, including Robert D. Weber, then in charge of Centrex rate matters at AT&T, began to consider the effect of the proposed changes on Centrex. In particular they considered whether the operating companies should establish separate charges for exchange access and intercommunication, so as to give Centrex subscribers the benefit of any tax reduction that might be enacted. Several methods of establishing separate charges were considered and found unsatisfactory; finally, for reasons noted hereafter, it was decided that separate charges should not be established. On December 29,

---

**56.** Except for an additional charge, in the case of Centrex-CO, resulting from the fact that the

switching equipment was located on telephone company premises. *See* p. 1109 *supra.*

1964, Weber sent a letter to rate personnel at a number of operating companies, soliciting their views on one possible method of separation. The reaction was mixed: some companies had no strong objections and others thought that the change should not be undertaken. This reaction confirmed Weber's belief that a separation of charges should not be recommended. Weber communicated his belief to the operating company personnel who responded to his letter.

In October 1965, after passage of the Act, there were two meetings of personnel from the operating companies to explain to them the changes brought about by the Act. The tax treatment of Centrex was one item discussed at these meetings, although in light of the extensive changes made by the Act it was by no means the only subject. The operating company personnel were told that unrestricted Centrex stations would be taxable while restricted stations would not be.[57] Also at this meeting, representatives of several of the operating companies inquired about the possibility of establishing separate charges for exchange access and intercommunication. They were told that AT&T had no plans to recommend that such a separation be made. Over the next few years several operating companies inquired of AT&T about the possibility of establishing separate charges, sometimes in response to questions from Centrex subscribers.[58] AT&T continued to advise against such a step for reasons to be discussed. During this period, no operating company established separate charges for exchange access and intercommunication, and several companies that had not previously filed Centrex tariffs did so using the

"package rate" and "single offering" concepts.

In 1971, because of a significant extension of the tax by Congress and changed competitive conditions, the matter was reassessed. A group at AT&T, including Robert M. Kemp, Weber's successor in charge of Centrex rate matters at AT&T,[59] developed a method of establishing separate charges for exchange access and intercommunication. A letter recommending that separate charges be established and describing the proposed method was sent by AT&T to the operating companies on September 27, 1971. The letter suggested that the companies follow a common method of establishing separate charges. Such uniformity was desired to minimize the burdens of any Internal Revenue Service audit by attempting to ensure that one audit of the method would suffice for all companies. Within a year and a half each of the operating companies had filed revised tariffs establishing separate charges for exchange access and intercommunication. In the great majority of cases the subscriber's Centrex rates were unchanged as a result.[60] However, the companies did not all adopt the method suggested by AT&T. Those who did not follow it discussed their own proposals with personnel at AT&T to try to ensure that their method would survive Internal Revenue Service scrutiny.

Of central importance to this case are the reasons why the Centrex rate structure was not modified until 1971, and, in light of plaintiffs' emphasis on AT&T's supposed domination of the operating companies, the reasons why first Weber and then Kemp, who it is contended were "at the heart and

---

**57.** *See* n. 14 *supra.*

**58.** The record reveals that five subscribers—American Oil Co., Monsanto Co. (a named *plaintiff herein*), *Union Carbide Corp.*, *Mobil Oil Corp.* and *Owens-Corning Fiberglass Corp.* —made inquiries to their respective operating companies between 1965 and 1970. In at least three cases the operating companies consulted with AT&T before answering that no separation would be made. In addition, the issue was discussed several times within AT&T.

**59.** Kemp had also been involved with Centrex rate matters in 1961 and had helped prepare the April 1961 Centrex materials.

**60.** The revised tariff filed by New York Telephone Co. in New York State decreased its Centrex station charges by a negligible amount, totalling an estimated $1,100 the first year. The Chesapeake and Potomac Telephone Co. of West Virginia sought a general rate increase simultaneously with its revised Centrex tariff. The revised tariffs filed by the other operating companies did not result in any change in their total Centrex station charges.

soul" of the conspiracy, did not recommend such a change. First, revising Centrex tariffs to reflect separate charges for exchange access and intercommunication was expected to be a difficult, expensive and time-consuming task, involving detailed engineering and cost studies, preparation of new tariffs, filing of those tariffs with regulatory commissions, extensive bookkeeping and administrative changes and retraining of personnel.[61] In particular there were difficulties in developing an appropriate method for establishing separate charges for Centrex-CO, in which the same stations, lines, and switching equipment provided exchange access and intercommunication. Second, the package rate concept of Centrex was relatively new. Many operating companies' Centrex tariffs were only a year

or two old and had apparently been well received by subscribers and regulatory commissions. It was felt that seeking to modify the "package rate" concept so soon after approval was undesirable and might meet resistance from regulatory commissions. Weber and Kemp also had doubts whether any method chosen to separate charges would be acceptable to the Internal Revenue Service; at least one method of establishing separate charges was rejected upon the advice of AT&T tax lawyers that the method would not pass IRS scrutiny.

In addition, Kemp and Weber were concerned about the possibility of an expensive, time-consuming challenge before a regulatory commission if new rates were filed. When a telephone company proposes to

---

**61.** Plaintiffs contend that the filing of new tariffs was not necessary in order to establish separate charges sufficient to meet the statutory requirement. In support of this claim they rely primarily upon the fact that language referring to tariffs was dropped from a draft of proposed excise tax legislation presented by AT&T lobbyists to the staff of the Joint Congressional Committee on Internal Revenue Taxation when the bill was submitted to the committee. However, this evidence is not relevant to the construction of the Act. The purpose of examining legislative history is to attempt to ascertain Congressional intent on ambiguous issues. See, e. g., Cantor v. Detroit Edison Co., 428 U.S. 579, 618, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976) (Stewart, J., dissenting); United States v. Wise, 370 U.S. 405, 414, 82 S.Ct. 1354, 8 L.Ed.2d 590 (1962); Marriott In-Flite Servs. v. Local 504, Air Transport Div., Transport Workers of America, 557 F.2d 295 at 298–299 (2d Cir. 1977); United States v. Thompson, 319 F.2d 665, 668 (2d Cir. 1963). Consideration of unofficial materials which were never, so far as the record shows, brought to the attention of a single Congressman cannot possibly shed light upon the intent of Congress. The meaning of "separate charge" as used in the Act must be found in the Act itself and its legislative history.

There is nothing in these sources to indicate that a "separate charge" was intended to mean anything other than a tariff charge, which would be the ordinary construction of a statute dealing with regulated public utilities, whose charges are required by law to be embodied in their tariffs. See p. 1106 supra. Reference to the regulation of telephone companies was in fact made on the Senate floor during discussion of the Act. 111 Cong.Rec. 13624–25, 14073 (1965) (remarks of Sen. Long).

In any event, the history cited by plaintiffs does not support their position. First, the reference to tariffs in the AT&T draft was made in attempting to distinguish local exchange service from toll telephone service and not in defining "private communication service." Moreover there is no explanation of why the language referring to tariffs was dropped; plaintiffs' theory that the committee staff intended to allow a separation of charges to be made without filing tariffs is pure conjecture. Cf. Trailmobile Co. v. Whirls, 331 U.S. 40, 61, 67 S.Ct. 982, 91 L.Ed. 1328 (1947); Gemsco, Inc. v. Walling, 324 U.S. 244, 260, 65 S.Ct. 605, 89 L.Ed. 921 (1945). In short, there is no indication that Congress intended to apply the "separate charge" provision to anything other than a tariff.

Plaintiffs also rely on Rev.Rul. 69–152, 1969–1 C.B. 289, which held that a sufficient "separate charge" existed when telephone company records identified separately the monthly charges for equipment and service even if the customer's bills did not. However, nothing in this ruling indicates whether or not the tariffs of the operating company in question had separate charges, nor does the ruling refer specifically to Centrex as opposed to PBX. In fact, in an unpublished technical advice memorandum communicated to defendants, the Internal Revenue Service adopted the position that the provisions of an operating company's tariff are controlling. In sum, Kemp, Weber, and other persons involved in considering the question of establishing separate charges, who received consistent advice from AT&T's tax attorneys that a tariff revision would be necessary, were fully justified in relying on that advice.

change existing tariffs, the subscribers to the service in question constitute a ready-made body of potential intervenors who might protest to the regulatory commission. While it is true that a change in tariffs which had only the effect of lowering the excise tax would be unlikely to attract much opposition, the fact remains that the rate-making personnel in the operating companies and AT&T recognized the possibility that either subscribers or commissions might take the opportunity to attack the Centrex rate structure in general. While these officials did not consider that any attack on Centrex rates would be justified or have merit, nevertheless the expense of litigating such a challenge could greatly increase the costs of making the change, and the ultimate outcome was uncertain.

Finally, Weber and Kemp believed during the years after passage of the Act that the communications excise tax would expire within a few years, especially since they were aware of AT&T's lobbying activities against the tax. Thus, they felt it was not worth going through a lengthy and expensive refiling of tariffs, which might itself have taken several years, for the sake of a tax savings that would shortly be achieved in any event. Plaintiffs respond that no knowledgeable person could have believed, in light of the government's need for reve-nue as a result of the Vietnam War, that the tax would be allowed to expire, and that AT&T's Washington lobbyists and tax attorneys were aware of this. But the fact remains that those persons who were responsible for the decisions relating to Centrex rates, and who testified credibly at the trial, did so believe. In fact this belief was not wholly unreasonable. While Congress on several occasions postponed the reduction and elimination of the excise tax, nonetheless at all times between 1965 and 1970 the tax was scheduled to expire within a few years and the Congressional reports indicated an intention that the tax be soon eliminated.[62] Defendants perhaps had an unduly optimistic view of likely Congressional action reducing or eliminating the tax, but it was a view for which they can hardly be faulted in light of Congressional attitudes at that time.

By 1971 two changed factors, already noted, prompted the recommendation to establish separate charges. First, Congress in 1970 provided that the communications excise tax would remain in effect for ten more years.[63] This removed one of the major reasons why a separation of charges had not previously been recommended, namely the prospect of an imminent elimination of the tax. Second, in 1968 the Federal Communications Commission had

---

**62.** The Tax Adjustment Act of 1966, Pub L. No. 89–368, § 202, 80 Stat. 38, which became effective only two and one-half months after the reduction of the excise tax effected by the Act, *see* p. 1111 *supra*, reinstated the 10% tax rate until April 1, 1968, at which time the tax was to be reduced to 1% as provided in the Act. The Congressional reports stated that the tax reduction was not "rescinded" but "merely postponed for 2 years . . . in view of current budgetary and economic conditions." H.R.Rep.No.1285, 89th Cong., 2d Sess. 9 (1966), *reprinted in* [1966] U.S.Code Cong. & Admin. News, pp. 1933, 1941; S.Rep.No.1010, 89th Cong., 2d Sess. 10 (1966), *reprinted in* [1966] U.S.Code Cong. & Admin.News, pp. 1985, 1993. In 1968, shortly before the tax was scheduled to be reduced pursuant to this act, it was temporarily extended at a 10% rate. P.L. 90–285, 82 Stat. 92 (1968). Later that year the 10% rate was extended for another year and a half, until January 1, 1970, and subsequent annual reductions to 5%, 3% and 1% were enacted, with total repeal planned for 1973. Revenue and Expenditure Control Act of 1968, P.L. 90–364, § 105(b), 82 Stat. 251. Similarly, the Tax Reform Act of 1969, which became effective two days before the scheduled reduction of the tax in 1970, postponed each annual reduction of the tax another year, with final elimination set for January 1, 1974. P.L. 91–172, § 702(b), 83 Stat. 487. Both in 1968 and 1969 Congress indicated that the extension of the tax was a temporary budgetary measure. H.R.Rep.No. 1104, 90th Cong., 2d Sess. 8 (1968), *reprinted in* [1968] U.S.Code Cong. & Admin.News, pp. 2341, 2348; S.Rep.No.1014, 90th Cong., 2d Sess. 12–13 (1968), *reprinted in* [1968] U.S. Code Cong. & Admin.News, pp. 2354, 2366; H.R.Rep.No.91–413, 91st Cong., 1st Sess., Part 1, at 12 (1969), *reprinted in* [1969] U.S.Code Cong. & Admin.News pp. 1645, 1656; S.Rep. No.91–552, 91st Cong., 1st Sess. 15 (1969), *reprinted in* [1969] U.S.Code Cong. & Admin. News, pp. 2027, 2042.

**63.** *See* p. 1111 *supra*.

struck down the provisions of the Bell System's tariffs that forbade non-Bell System equipment from interconnecting with the telephone network.[64] As a result more direct competition in business telephone service began to materialize in 1971. This indicated that a separation would be desirable because effecting a decrease in the tax would enable the defendants' Centrex service better to face competition both from non-Bell System equipment and from the defendants' own untaxed PBX systems.[65] The impact of Centrex' competitive disadvantage was increased by recent Internal Revenue Service rulings that had treated as taxable certain auxiliary services provided with Centrex which previously had been considered non-taxable.[66]

Plaintiffs deny that these were the factors motivating the defendants. As previously noted, they contend that the failure to establish separate charges for exchange access and intercommunication was the object of a conspiracy to prevent regulatory scrutiny of Centrex rates that might have revealed that they were excessive or discriminatory. However, plaintiffs' argument is based largely upon fragmentary excerpts from documents and testimony taken out of context. The totality of the evidence negates plaintiffs' contentions. At no time were officials of the operating companies concerned that upon the filing of revised tariffs, regulatory commissions would hold Centrex rates excessive or discriminatory. All the witnesses who testified at the trial —Kemp, Weber, and two operating company rate-making officials—testified that they neither had themselves, nor had expressed to them, such concern. It is true that one of the reasons revised Centrex tariffs were not filed was the possibility of regulatory proceedings. But the defendants were not, as plaintiffs contend, seeking to protect excessive rates of return; rather, they wanted to avoid the time, burden, and expense of such a proceeding, and its uncertain outcome. This was a natural and legitimate concern of defendants' officers and employees, if not their duty, and does not establish a conspiratorial purpose. As one witness put it, a rate proceeding was a "can of worms."

Moreover, plaintiffs have not established that there was any basis for apprehension that rates were excessive. Centrex earnings were generally higher than PBX earnings, but the defendants felt that they had not been earning an adequate rate of return on PBX service. Any question about the level of Centrex rates was based as much on concern that the rates would be held too low in relation to individual business line rates as on concern that they would be found too high in relation to PBX rates. In fact in 1972 the Colorado Public Utilities Commission ordered the rates on Centrex-CO raised substantially, holding that Centrex-CO was essentially similar to individual business line service.[67] Although the United States Government, between 1961 and 1965, filed three challenges to Centrex rates, in each case the rates were sustained against claims that they were excessive.[68]

**64.** Use of the Carterfone Device in Message Toll Telephone Service, 13 F.C.C.2d 420 (1968).

**65.** The prospect of competition also raised concern that, because Centrex-CO and Centrex-CU were made a single offering, a competitor might claim that one service unfairly subsidized the other, even if this were not the case. This consideration suggested that Centrex-CO and Centrex-CU should be separated from each other, but did not directly affect the decision whether or not to establish separate charges for exchange access and intercommunication.

**66.** *See* Rev.Rul. 73–270, 1973–1 C.B. 444, a published version of rulings previously made privately to various Bell System companies.

**67.** *Mountain States Tel. & Tel. Co.,* Dec. No. 81320 (Colo.P.U.C.1972), *aff'd,* 186 Colo. 260, 527 P.2d 524 (1974). See also *Mountain States Tel. & Tel. Co.,* Dec. No. 83232 (Colo.P.U.C. 1973).

**68.** In 1962 the Department of Defense filed a protest to the Centrex tariffs filed by Southern Bell Telephone and Telegraph Co. in Tennessee; the Tennessee Public Service Commission dismissed the protest on April 17, 1963, which order was affirmed by the Tennessee Chancery Court in 1964. An appeal was dismissed by stipulation. Also in 1962 the Department of Defense filed a protest with respect to Southern Bell's Centrex tariffs in Louisiana, but the protest was never prosecuted. In 1963 the

Insofar as the record reveals, these were the only challenges to Centrex rates. Moreover, there is testimony that in at least one instance the rates were reviewed by the appropriate state agency prior to filing so that there was never any question that they were excessive. Thus there is no support for the contention that the defendants were motivated by a concern that Centrex rates would be found excessive.

Nor have plaintiffs shown that Centrex rates discriminated between Centrex-CU and Centrex-CO subscribers. Plaintiffs make two claims in this respect. First, they contend that Centrex-CO cost the operating companies more than Centrex-CU and that subscribers who received Centrex-CU thus subsidized those who received Centrex-CO. The evidence on this point is ambiguous. While the AT&T recommendations of April 1961 indicated that, based on the costs assumed in the illustrative rate structure, Centrex-CO would cost more than Centrex-CU because of the cost of the lines running from the subscriber's premises to the central office, rate-making personnel at AT&T and the operating companies could not be sure of the actual costs of the two types of service, since the accounting procedures prescribed by the Federal Communications Commission for the operating companies prevented any precise estimate of those costs without a major survey.

Plaintiffs' second claim of discrimination is that Centrex-CO was more advantageous to the subscriber than Centrex-CU in several respects: first, because it provided IOD through ANI rather than through an operator using the CAMA system; second, because the Centrex-CU switching equipment was located on the subscriber's premises and was bulky, noisy and heavy; and third, because the Centrex-CO switching equipment was more modern and capable. There is no evidence, however, that subscribers were concerned about the size, noise or weight of Centrex-CU switching equipment on their premises; indeed, AT&T has this

equipment at its own main office in New York City. Nor is there evidence that customers preferred CAMA, which provided a service essentially identical to ANI. In any event, only a small percentage of telephone calls, five to ten percent, used IOD by any means. Finally, while the switching equipment may have differed, the basic service provided by Centrex-CO and Centrex-CU was functionally similar; there is no evidence subscribers were concerned about the technical capabilities of their switching equipment.

More important, the fact that there were some differences between Centrex-CU and Centrex-CO does not establish that there was rate discrimination. It is common in the telephone industry to provide what is essentially the same service through different types of equipment, and to charge a single rate for the service. Thus, while the Bell System has been introducing direct distance dialing, some customers have had CAMA and some have had ANI in connection with their long distance calls, yet all have been charged the same rate. Similarly, the costs of serving residential or business customers may vary widely depending on the subscribers' distance from the central office and the physical aspects of the installation. Yet it is common to provide such service based upon the average cost of serving all subscribers. In other words, the fact that Centrex service was provided with two different types of equipment at a single rate was not cause for concern, since Centrex-CU and Centrex-CO were functionally equivalent.

In sum, based upon the totality of the evidence, including the trial testimony and the forthright demeanor of Kemp and Weber, the Court rejects plaintiffs' contention that the defendants' failure to file separate charges for exchange access and intercommunication after 1965 was motivated by a desire to shield Centrex rates from regulatory scrutiny.

General Services Administration filed a Petition for Investigation with the New York Public Service Commission, with respect to New York

Telephone Company's Centrex tariffs. The petition was ultimately dismissed by the Public Service Commission on November 9, 1965.

#### d. The Charge of Conspiracy or Illegal Agreements

■ Plaintiffs' claim that there was an agreement among the defendants to maintain a uniform rate structure and not to establish separate charges is to be considered in light of the foregoing facts. According to plaintiffs this conspiracy was directed by AT&T, and the operating companies "marched together in close formation." Plaintiffs characterize the materials sent by AT&T to the operating companies in 1961 as "instructions" rather than recommendations. They point to the emphasis on the importance of uniformity among the operating companies, and to the fact that in filing Centrex tariffs each company adhered to what plaintiffs consider the "principal features" of Centrex service, namely the package rate, single offering, and reservation of choice of Centrex-CU or Centrex-CO to the operating company, as evidence that the operating companies agreed to follow the AT&T "instructions." Plaintiffs further argue that in 1964 AT&T made a decision not to establish separate charges for exchange access and intercommunication; that the various conferences and communications between AT&T and the operating companies left the latter with not "the slightest doubt as to AT&T's wishes or as to the course that the other defendant operating companies would follow"; and that in fact none of the companies deviated from AT&T's position. Plaintiffs claim that, absent an agreement among the defendants, one or more of the operating companies would have found it in its own interest to revise its Centrex tariffs and to establish separate charges so as to save its customers the tax, and that the failure of any company to do so leads to an "overwhelming inference" that there was a conspiracy among the defendants.

However, the relationship among the defendants is of crucial significance in considering whether the evidence supports a finding of conspiracy.[69] The operating companies are all subsidiaries of or affiliated with AT&T, and AT&T is obligated under its license contracts to provide them technical advice and assistance. This arrangement affords each of the operating companies the benefit of the research and technical expertise available to the Bell System as a whole. In Weber's words, AT&T provides a "centralized staff resource" for the operating companies. Given this relationship it was only natural that rate-making personnel from the operating companies should seek and receive advice from their coordinates at AT&T on rate and tax matters, and that personnel at AT&T should seek information from their coordinates in the operating companies to assist them in developing recommendations. These contacts were frequent, but were in the nature of an exchange of information and advice, not of solicitation and acceptance of concerted action. Thus, the fact that the operating companies conferred with or were advised by their parent organization, or exchanged views with one another, does not necessarily establish that they engaged in illegal concerted or collaborative action.

Moreover, AT&T did not give any "instructions" to the operating companies. The materials sent to the operating companies in April 1961 were no more than recommendations developed pursuant to AT&T's obligations under the license contracts. The persons who prepared those recommendations felt that they constituted a desirable and reasonable method of establishing Centrex rates, and that uniformity among the operating companies would be desirable to facilitate customer comprehension. These opinions were communicated to the operating companies in the April 1961 material and the May 1961 meeting. But it was also stated that each operating company was free to devise its own Centrex rate structure based upon its own evaluation of its own needs. The recommendations were not mandatory upon the operating companies. No representative of any operating

---

**69.** Cf. *United States v. Citizens & Southern Nat'l Bank*, 422 U.S. 86, 113–14, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975).

company, during the May 1961 meeting or at any other time, made any agreement, either with AT&T or with any other operating company, to follow any of AT&T's Centrex rate recommendations, or understood that any other operating company was committed to doing so. Rather, each operating company was an independent entity with its own rate-making personnel, which made its own decisions as to the type of tariffs it would file, taking into account AT&T's recommendations as well as other relevant factors.[70]

This independence of judgment is borne out by an examination of the operating companies' Centrex tariffs. One company, Michigan Bell, filed its Centrex tariffs even before receiving the AT&T recommendations.[71] Although most of the other operating companies filed Centrex tariffs within two years after receiving the AT&T recommendations, several did not initiate Centrex service for several years thereafter.[72] The operating companies' Centrex tariffs were not sent to AT&T for review or approval prior to filing, although persons at AT&T were generally aware of the status of the tariffs and were available to respond to specific inquiries and to give advice. While each of the Centrex tariffs did follow the broad outlines of the AT&T recommendations in some respects, including the package rate, single offering, and effective reservation of choice to the operating company, this is not surprising in light of the extensive work, including input from the

operating companies, that went into developing the recommendations so that they would be generally appropriate. Moreover, the operating companies' tariffs departed in many other respects from the AT&T recommendations. Three companies did not offer Centrex-CO in one or more jurisdictions. In many jurisdictions not all of the service features recommended by AT&T as part of the basic Centrex offering were included.[73] The minimum number of stations required per subscriber, the initial contract period, and the actual rates all varied widely among the companies.[74] While plaintiffs claim that these variations were "minor," they nonetheless indicate that each operating company individually exercised independent judgment in developing its Centrex rates.

Plaintiffs have also failed to support their claim that there was any agreement among the defendants not to establish separate charges for exchange access and intercommunication following passage of the Act. No commitment not to establish separate charges was ever sought by AT&T or given by any operating company. The Bell System meetings in October 1965 were informational meetings of "implementers," not policy-making conferences. AT&T informed the operating companies at those meetings of its interpretation of the Act because the operating companies relied heavily on AT&T for such advice and not for the purpose of instructing the operating

**70.** In this respect this case differs from *United States v. Masonite Corp.,* 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942) and *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). In each of those cases competitors entered into separate agreements with a third party. The Supreme Court found the evidence sufficient to establish that, despite the fact that each defendant made its agreement independently, each was aware that common action was being taken, and a conspiracy was thus found. In this case, the evidence does not establish that there was any agreement between any of the operating companies and AT&T.

**71.** However, Michigan Bell was represented on the Task Committee, and thus rate-making personnel at Michigan Bell were generally aware

of the committee's approach even before the April 1961 recommendations were received.

**72.** Centrex tariffs were not filed by nine companies in eleven states in the two years following AT&T's initial recommendations. Centrex tariffs were not filed by six companies in six states until 1965 or later.

**73.** Three companies in three states did not offer the intercept service; four companies in eight states did not offer night connections. Each of these was part of the basic Centrex package described in AT&T's April 1961 material, *see* pp. 1116–1117 *supra.* Moreover, over half of the companies did not offer station hunting, a supplemental service recommended by AT&T.

**74.** *See* n. 84 *infra.*

companies to maintain their Centrex rate structures unchanged. Other evidence also shows that the operating companies continued to exercise independent judgment in connection with their Centrex tariffs. Arthur X. Ichter, the rate supervisor for defendant Bell Telephone Company of Pennsylvania, testified that he independently decided that Bell of Pennsylvania and Diamond State Telephone Company, for which he also did rate work, should establish separate charges before he learned that AT&T was considering the same step. Several other operating companies began work on establishing separate charges before receiving AT&T's recommendations. Finally, a number of the operating companies rejected AT&T's recommended method of establishing separate charges and developed their own method.

While it is true that none of the defendants modified their Centrex rate structure until 1971, this by itself does not establish that there was concerted action.[75] The evidence establishes not only that it was not against the interests of each individual defendant to maintain the package rate, as plaintiffs contend, but that in fact there were legitimate business reasons for this parallel behavior sufficient to negate any inference that it was the result of an agreement among the defendants. These reasons included the widespread acceptance of Centrex rates, its ready marketability, the burden of filing new tariffs, the possibility of a time-consuming and costly challenge before regulatory commissions or by the Internal Revenue Service, and the expected elimination of the excise tax. Under these circumstances the defendants' maintenance of a rate structure which was apparently proving successful and profitable does not give rise to any inference that they conspired to do so.[76]

In sum, upon the totality of the relevant and probative evidence in the case, including the testimony of those witnesses who testified at the trial, which the Court accepts as credible, the plaintiffs have failed to establish their claim that the defendants entered into any conspiracy relating to Centrex rates. In essence, the plaintiffs attempt to base an inference of conspiracy upon the facts that during the relevant period AT&T made certain recommendations to the operating companies and that the operating companies generally followed those recommendations. But the evidence fails to establish that there was a "common design and understanding"[77] among the defendants; rather, each operating company exercised its own independent judgment and was free to accept or reject AT&T's recommendations in whole or in part.

### e. *Restraint of Trade—Price Fixing*

The determination that plaintiffs have failed to establish the first essential element of their claim should conclude the matter. However, since there may be appellate review, it is desirable to consider whether plaintiffs have established the other essential element of their antitrust charge. Even were the Court to find that the defendants entered into the twin agreements alleged by plaintiffs, namely one in 1961 to fix a uniform Centrex rate structure and one after 1965 not to establish separate charges for exchange access and intercommunication, to prevail plaintiffs must establish that those agreements were in restraint of trade. Plaintiffs' most vigorously pressed contention in this regard is that the alleged conspiracy was price fixing and should be declared per se illegal. While recognizing that the agreements alleged herein do not precisely fit the mold of a classic price fixing conspiracy, plaintiffs argue that they are sufficiently similar to price fixing to be treated as such. As set forth in their pretrial brief, plaintiffs' claim is as follows:

> who filed initial Centrex tariffs after 1965 logically chose to adopt a similar rate structure.

**75.** *See* pp. 1111–1113 *supra.*

**76.** *Cf. American Tel. & Tel. Co. v. Delta Communications Corp.*, 408 F.Supp. 1075, 1097 (S.D.Miss.1976). Similarly, those companies

**77.** *See* p. 1112 *supra.*

The purpose of the conspiracy was to avoid scrutiny of Centrex rates, including the artificial Centrex-CO and Centrex-CU near uniformity, and to avoid competitive erosion of the rates. The purpose was, in sum, to maintain and stabilize the Centrex rate structure—*i. e.*, prices—albeit not at a single rate level but at whatever the then current charge was in each defendant operating company's tariff. But maintaining the package Centrex rate acted directly to increase the price paid by Centrex customers. By their uniform action, the defendants increased the price paid by each plaintiff in an amount equal to the federal communication excise tax collected on the intercommunication portion of their Centrex service.

The conspiracy in the present case raised the price of the service it marketed by a measurable amount—and maintained rigid control over the price level until the agreement to maintain the rate structure was replaced in 1971. It was a conspiracy to fix prices within the meaning of the decided cases, and was unlawful *per se.*

Despite plaintiffs' ingenious argument, however, the Court is convinced that the alleged conspiracy is not price fixing. There are significant differences between the conspiracy alleged here and the ordinary price fixing conspiracy among horizontal competitors.[78] The defendants are affiliated corporations which do not compete with each other in providing telephone service and which are regulated monopolists in their respective service areas. The actual relationship among the defendants—the so-called "federal system"[79]—and their affiliation in a nation-wide telephone system distinguish this case from a case of price fixing among independent competitors.[80] Moreover, while the plaintiffs claim that the equivalent of competition exists among the defendants, in that a decision by one operating company to establish separate charges would have led customers and regulatory commissions to put pressure on the others to do likewise, the absence of *actual* competition militates against application of the per se rule.[81]

Second, to be considered price fixing the agreements must have restricted the operating companies' freedom to set prices according to their own business judgment.[82]

---

**78.** Plaintiffs contend that the conspiracy can be viewed as a vertical one between AT&T and its subsidiaries because of the license agreements between them. This claim is without merit. Vertical price fixing is an agreement between a supplier and a customer fixing the resale price of a commodity, as in *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968); *Simpson v. Union Oil Co.,* 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); *United States v. Parke, Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). *See United States v. Topco Assocs., Inc.,* 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *Knuth v. Erie-Crawford Dairy Coop. Ass'n,* 326 F.Supp. 48, 53 (W.D.Pa.1971), *aff'd in part and rev'd in part on other grounds,* 463 F.2d 470, 475 (3d Cir. 1972), *cert. denied,* 410 U.S. 913, 93 S.Ct. 966, 35 L.Ed.2d 278 (1973). The operating companies do not purchase Centrex service from AT&T; their relationship is thus not the sort of vertical one that leads to per se condemnation.

**79.** *See* p. 1106 *supra.*

**80.** *See United States v. Citizens & Southern Nat'l Bank,* 422 U.S. 86, 113–14, 95 S.Ct. 2099, 45 L.Ed.2d 41 (1975).

**81.** *Evans v. S. S. Kresge Co.,* 544 F.2d 1184, 1192–93 (3d Cir. 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 2973, 52 L.Ed.2d 1092 (1977); *United States v. Columbia Pictures Corp.,* 169 F.Supp. 888, 893 (S.D.N.Y.1959); *see Call Carl, Inc. v. BP Oil Corp.,* 403 F.Supp. 568, 572–73 (D.Md.1975). In any event, the Court finds that such "competition" did not exist. *See* p. 1130 *infra.*

**82.** *Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc.,* 340 U.S. 211, 213, 71 S.Ct. 259, 95 L.Ed. 219 (1951); *Chisholm Bros. Farm Equip. Co. v. International Harvester Co.,* 498 F.2d 1137, 1142 (9th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974); *Adolph Coors Co. v. FTC,* 497 F.2d 1178, 1184 (10th Cir. 1974), *cert. denied,* 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975); *Merit Motors, Inc. v. Chrysler Corp.,* 417 F.Supp. 263, 267 (D.D.C.1976); *Jacobi v. Bache & Co.,* 377 F.Supp. 86, 95–96 (S.D.N.Y.1974), *aff'd,* 520 F.2d 1231 (2d Cir. 1975), *cert. denied,* 423 U.S. 1053, 96 S.Ct. 784, 46 L.Ed.2d 642 (1976); *Pearl Brewing Co. v. Anheuser-Busch, Inc.,* 339 F.Supp. 945, 952 (S.D.Tex.1972); *Bailey's Bakery, Ltd. v. Continental Baking Co.,* 235 F.Supp. 705, 720 (D.Haw.1964); *see United States v.*

"Conduct or agreements not restricting a competitor's pricing independence . . . falls short of illegal price fixing."[83] In this case the alleged conspiracy did not limit the pricing decisions of any operating company. It related solely to the structure of Centrex rates—namely the package rate and single offering—and had no effect whatsoever on the charge for Centrex service. As the plaintiffs themselves state, "[r]ate levels as such are not at issue here. Rate structure is." Each operating company was free to set its Centrex rates at whatever level it desired, subject of course to the approval of regulatory commissions. Indeed the stipulated facts reveal that there was great variation in the rates charged for Centrex service.[84] As previously noted, the evidence does not establish that these rates were in any way excessive, or that the alleged agreement among defendants affected them in any other way.[85]

The only effect the plaintiffs have actually shown upon the "price" of Centrex service is that Centrex subscribers paid more excise tax than if separate charges had been established. However, the Federal excise tax is not part of the price of telephone service; rather it is imposed on the price paid for that service.[86] The tax is imposed on the plaintiffs; the defendants are merely the collecting agents for the government[87] and are not the beneficiaries of the tax. They retained none of the taxes collected from the plaintiffs but paid them over to the United States as required by law. When separate charges were established, the Centrex rates paid by the plaintiffs to the defendants remained the same; only the taxes plaintiffs paid to the government decreased. Under these circumstances, any agreement among the defendants to establish a uniform rate structure, which had as an incidental effect an increase in the tax paid by customers, cannot by reason of the tax increase alone constitute price fixing.

Nor was the purpose of the alleged conspiracy the fixing of Centrex prices. A uniform Centrex rate structure was desired, not to fix the price for Centrex service, but to enable it to be provided as efficiently as possible and to facilitate marketing.[88] Similarly, even if defendants agreed not to file separate charges after passage of the Act, this agreement was not motivated by a purpose to protect Centrex rates from regulatory scrutiny but rather, as previously noted, by a desire to avoid the expense and burden of filing new tariffs and by the anticipated demise of the excise tax. Thus, neither the purpose nor the effect of the agreement among the defendants was to restrict the operating companies' pricing freedom.

Thus the conspiracy which the plaintiffs claim the defendants entered into is unlike

*Socony-Vacuum Oil Co.*, 310 U.S. 150, 223–24, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *cf. Arizona v. Cook Paint & Varnish Co.*, 391 F.Supp. 962, 966–67 (D.Ariz.1975), *aff'd* 541 F.2d 226 (9th Cir. 1976), *cert. denied*, 430 U.S. 915, 97 S.Ct. 1327, 51 L.Ed.2d 593 (1977).

**83.** *Checker Motors Corp. v. Chrysler Corp.*, 283 F.Supp. 876, 882–83 (S.D.N.Y.1968), *aff'd*, 405 F.2d 319, 322–23 (2d Cir.), *cert. denied*, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969).

**84.** On January 1, 1963, the operating companies' rates for the first 50 Centrex stations of a subscriber varied from $6.30 per station to $11.50 per station; on January 1, 1966, those rates varied from $6.30 to $16.50. Similar variations existed at other levels of the defendants' Centrex rate structures, which were tapered so that a subscriber paid a lower rate per station when he required a large number of stations.

**85.** *See* pp. 1122–1123 *supra.*

**86.** I.R.C. §§ 4251 ("[T]here is hereby imposed on amounts paid for the following communication services a tax . . ."), 4254 ("If a bill is rendered the taxpayer for local telephone service . . . the amount on which the tax with respect to such services shall be based shall be the sum of all charges for such services included in the bill"); *see Carrigan v. Sunland-Tujunga Tel. Co.*, 263 F.2d 568, 571 (9th Cir.), *cert. denied*, 359 U.S. 975, 79 S.Ct. 893, 3 L.Ed.2d 841 (1959). *But see Agron v. Illinois Bell Tel. Co.*, 449 F.2d 906, 912–13 & n. 13 (7th Cir. 1971), *cert. denied*, 405 U.S. 954, 92 S.Ct. 1171, 31 L.Ed.2d 231 (1972).

**87.** *See generally DuPont Glore Forgan Inc. v. American Tel. & Tel. Co.*, 428 F.Supp. 1297 (S.D.N.Y.1977).

**88.** *See* pp. 1117–1118 *supra.*

the typical price fixing conspiracy in several important respects and should not be subject to the per se rule. The rationale of the per se rule is that certain classes of agreement are so familiar and their anticompetitive effects so well known that the courts will not engage in the detailed factual inquiry necessary to establish those effects in each case but will declare them illegal as a class. However, "[i]t is only after considerable experience with certain business relationships that courts classify them as *per se* violations of the Sherman Act."[89] In this case, as the Supreme Court stated in *White Motor Company v. United States:*[90]

> We need to know more than we do about the actual impact of these arrangements on competition to decide whether they have such a "pernicious effect on competition and lack . . . any redeeming virtue" . . . and therefore should be classified as *per se* violations of the Sherman Act.

### f. Restraint of Trade—Rule of Reason

Plaintiffs alternatively contend that the agreement among the defendants violated the "rule of reason."[91] Mr. Justice Brandeis' formulation remains the classic definition of an unreasonable restraint of trade:

> Every agreement concerning trade, every regulation of trade, restrains. To bind, to restrain, is of their very essence. The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must

ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.[92]

Measured against this standard, plaintiffs have not shown that the alleged conspiracy constituted an unreasonable restraint of trade, for many of the reasons previously discussed. Plaintiffs have failed to show that the conspiracy had any substantial anticompetitive effect. Several factors lead to this conclusion. First, plaintiffs contend merely that the defendants agreed to establish and maintain a uniform Centrex rate structure. Such agreements, even assuming their existence, limited the defendants' economic freedom only slightly, since they did not restrict any operating company's ability to offer Centrex at whatever price it desired with whatever service features it desired, or even not to offer Centrex at all, as the tariffs actually filed demonstrate. Second, each of the operating companies' telephone service is regulated by state law. State and local regulatory commissions are empowered to assure the fairness and reasonableness of defendants' tariffs, including the Centrex tariffs at is-

---

**89.** *United States v. Topco Assocs., Inc.,* 405 U.S. 596, 607–08, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972); *see Continental T.V., Inc. v. GTE Sylvania Inc.,* —— U.S. ——, —— —— & n. 16; 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963); *Northern Pac. Ry. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

**90.** 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963). *See also Evans v. S. S. Kresge Co.,* 544 F.2d 1184, 1190–91 (3d Cir. 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 2973, 53 L.Ed.2d 1092 (1977); *Arizona v. Cook*

*Paint & Varnish Co.,* 391 F.Supp. 962, 967 (D.Ariz.1975), *aff'd,* 541 F.2d 226 (9th Cir. 1976), *cert. denied,* 430 U.S. 915, 97 S.Ct. 1327, 51 L.Ed.2d 593 (1977).

**91.** *See* p. 1113 *supra.*

**92.** *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918); *accord, Continental T.V., Inc. v. GTE Sylvania, Inc.,* —— U.S. ——, —— n. 15, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977); *White Motor Co. v. United States,* 372 U.S. 253, 261–62, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963).

sue here.[93] Each of the defendants' tariffs was allowed to become effective by the appropriate regulatory commissions. So far as appears from the record no commission disapproved of the defendants' Centrex tariffs on any ground between 1961 and 1972. Plaintiffs argue, however, that the conspiracy was directed at regulatory authorities as well as customers and was intended to undermine their ratemaking activities—and their safeguarding of customers' interests—by avoiding regulatory review of Centrex rates. This contention, repeatedly pressed, assumes that the public agencies were derelict in carrying out their statutory duties. Nothing has been presented to support this claim.

Finally, as already noted, there was in fact no competition among the defendants to be restrained. Since each operating company is a legal monopolist within its service area, a subscriber who desired Centrex service had no choice of which defendant to obtain it from or what price to pay. In fact, to the extent the alleged conspiracy had any impact on competition it benefitted the defendants' only competitors, by subjecting Bell System Centrex service to the excise tax while non-Bell System intercommunication systems were not taxed, enabling the latter to compete more effectively with the operating companies in the sale of intercommunication equipment. In addition, the defendants were all affiliated members of a single Bell System, not independent competitors. Thus, even in the absence of the alleged agreement there was no competition among the defendants to be restrained.

Plaintiffs claim, however, that this agreement did restrain competition among the defendants, because "the conspirators' pricing decisions, if made independently, would have had some impact on each other—i. e., . . . they had an anti-competitive reason for agreeing to maintain uniform prices." According to plaintiffs, if one operating company, acting independently, had established separate charges for exchange access and intercommunication after the Act was passed, those of its subscribers who also received Centrex services from other operating companies in other service areas would put pressure on those operating companies to establish separate charges, thus setting in motion a chain reaction. However, although some subscriber pressure did develop in 1971 when separate charges were established, concern about such pressure did not motivate the defendants at any time. In fact uniformity of Centrex rate structure was desired, not to forestall customer pressure to establish separate charges or for lower rates, but to facilitate ease of marketing and customer understanding of Centrex by providing a similar service in each jurisdiction. A second factor favoring uniformity after 1965 was the desire to have all the Bell System companies apply the excise tax similarly to secure a single uniform ruling from the Internal Revenue Service. In sum, there was no competition among the defendants to be restrained, even accepting plaintiffs' expanded definition of "competition."[94]

Not only did the conspiracy have no substantial anticompetitive effect, but it was

---

**93.** *E. g.,* Cal.Pub.Util.Code §§ 451, 454, 455 (West 1975); Fla.Stat.Ann. §§ 364.03, 364.14 (West 1968); Ill.Rev.Stat. ch. 111⅔, §§ 32, 36, 41 (1973); Mass.Ann.Laws ch. 159, §§ 14, 17, 19 (Michie/Law.Co-op.1970); N.Y.Pub.Serv.L. §§ 91, 97 (McKinney 1955); Ohio Rev.Code Ann. §§ 4905.22, 4909.17, 4909.18 (Page 1977).

**94.** The cases cited by plaintiffs do not support their proposition. In cases involving division of markets, such as *United States v. Topco Assocs., Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *Timken Roller Bearing Co. v. United States,* 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); and *Addyston Pipe & Steel Co. v. United States,* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899), the illegality is based on

the fact that, but for the agreement, there would likely have been *actual* competition among the defendants. Here there would never have been such competition. *United States v. Falstaff Brewing Corp.,* 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973), was decided under § 7 of the Clayton Act, as amended, 15 U.S.C. § 18, which was "intended to reach incipient monopolies and trade restraints outside the scope of the Sherman Act." *Brown Shoe Co. v. United States,* 370 U.S. 294, 318 & nn. 32, 33, 82 S.Ct. 1502, 1520, 8 L.Ed.2d 510 (1962); *see United States v. Falstaff Brewing Corp.,* 410 U.S. 526, 555–58, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973) (Marshall, J., concurring).

undertaken for no anticompetitive purpose. The Court has already noted that the reasons for establishing a uniform Centrex rate structure, with a package rate, single offering, and reservation of choice to the operating company, were in large measure related to providing Centrex in the most efficient manner possible, by ensuring that the operating companies could use the most economical type of equipment in each situation. While plaintiffs characterize the defendants' desire for efficiency as an anticompetitive motive, the ultimate beneficiaries of any savings effected were the subscribers. If the operating companies had been forced to retire $600,000,000 of PBX switching equipment in advance of full depreciation, or if they had allowed Centrex subscribers to choose whichever type of service they desired regardless of cost, the resulting increase in operating cost and capital investment would have been passed on to subscribers in the normal course of events. Similarly, as previously stated, the reason Centrex charges were not separated immediately after passage of the Act was not to attempt to shield excessive or discriminatory rates, but to try to prevent unnecessary expenditures in connection with the filing of new tariffs. The alleged agreement was neither anticompetitive nor unreasonable.

Thus, the plaintiffs have not prevailed on their antitrust claim. The defendants entered into no contract, combination or conspiracy to establish and maintain a uniform Centrex rate structure; in any event, any such agreement would not have constituted an unreasonable restraint of trade in the circumstances of this case.[95]

## III. BREACH OF DUTY CLAIM

■ The second theory upon which plaintiffs seek recovery is that the Act, when construed in the context of the excise tax collection provisions of the Internal Revenue Code,[96] Article I, Section 8, of the United States Constitution, sections 201 and 202 of the Federal Communications Act,[97] state statutes regulating telephone companies as public utilities, and common law principles,[98] imposed upon the defendant operating companies an obligation, owed to members of the plaintiff class, to establish sepa-

---

**95.** In light of this decision it is unnecessary to consider several claims advanced by defendants with respect to the antitrust charges. Defendants contend that, even if their actions violated the antitrust laws, plaintiffs cannot recover treble damages because the defendants' Centrex rates were embodied in tariffs filed with public utility regulatory commissions. *See Georgia v. Pennsylvania R. R.,* 324 U.S. 439, 453, 65 S.Ct. 716, 89 L.Ed. 1051 (1945); *Keogh v. Chicago & N. W. Ry.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922). Each of these cases involved tariffs filed with the Interstate Commerce Commission, a federal agency, and thus involved the proper harmonization of two federal statutes, whereas the case at bar involves allegedly conflicting federal and state law. *See generally Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976). Significantly different considerations may be applicable in each case. *See Litton Systems, Inc. v. Southwestern Bell Tel. Co.,* 539 F.2d 418, 420–24 (5th Cir. 1976); Handler, Twenty-Fourth Annual Antitrust Review, 72 Colum.L.Rev. 1, 14 (1972).

Defendants also contend that the plaintiffs were not injured in their business or property as required by § 4 of the Clayton Act, 15 U.S.C. § 15, and that they have not shown the requisite effect upon interstate commerce.

**96.** I.R.C. §§ 4251, 4291, 7501; *see generally DuPont Glore Forgan Inc. v. American Tel. & Tel. Co.,* 428 F.Supp. 1297 (S.D.N.Y.1977).

**97.** 47 U.S.C. §§ 201, 202. Section 201 requires that "[a]ll charges, practices, classifications, and regulations for and in connection with [interstate or foreign] communication service, shall be just and reasonable"; section 202 makes it unlawful for telephone companies "to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with [interstate or foreign] communication service."

**98.** While the plaintiffs analogize the defendants' role to that of a corporate fiduciary, *cf. Oil & Gas Ventures—First 1958 Fund, Ltd. v. Kung,* 250 F.Supp. 744, 749 (S.D.N.Y.1966), they expressly disclaimed any contention that the defendants actually had any such common law duty, and base their claim entirely upon the Act. *Cf. Board of Public Util. Comm'rs v. New York Tel. Co.,* 271 U.S. 23, 31, 46 S.Ct. 363, 70 L.Ed. 808 (1926); *Jacob Goodman & Co. v. New York Tel. Co.,* 285 App.Div. 404, 408, 137 N.Y.S.2d 797, 800, *aff'd,* 309 N.Y. 258, 128 N.E.2d 406 (1955).

rate Centrex station charges for exchange access and intercommunication within the meaning of the Act. Plaintiffs claim that since the defendants failed to establish such separate charges within a reasonable time, in violation of this alleged duty, they are liable to plaintiffs for the amount of tax collected on the intercommunication portion of their Centrex service.[99]

The statute itself merely states that tax-exempt private communications service "does not include any communication service unless a separate charge is made for such service."[100] Plaintiffs, recognizing that this language does not expressly impose any duty upon defendants, contend that such a duty is implicit in the legislative history and context in which the Act was passed. The Congressional committee reports noted that "it is understood" that Centrex systems "do not, as yet," provide separate charges for exchange access and intercommunication, and that "[u]ntil such a separation is made," Centrex service would continue to be taxed.[101] This language cannot fairly be read to impose upon the defendants the duty to establish separate charges;[102] rather, it reflects recognition by Congress of existing facts, including the possibility that separate charges might be established in the future.

Plaintiffs point, however, to statements in the legislative history indicating that the benefits of the Act should be passed through to consumers[103] from which they seek to infer that a duty was imposed upon the defendants to make these benefits available within a reasonable time. However, these statements do not refer specifically to the Act's private communication service provisions, which were but a small part of the general reduction and elimination of a wide variety of excise taxes accomplished by the Act. In fact, a reading of the Congressional committee reports makes it clear that, while the provisions for a phased repeal of the communications excise tax were intended to benefit subscribers, the removal of taxes on private communication service was primarily for the benefit of the defendants themselves, to enable them to compete with non-Bell System companies.[104] In addition, it was recognized in colloquy on the Senate floor that Congress' hope that the benefits of the general excise tax reductions of the Act would be passed on to consumers did not create an enforceable duty to do so, because there was "no authority . . . to stop retailers from increasing their prices, or keeping as profit the full amount of the tax reduction."[105]

**99.** Defendants contend that even if the Act did impose such a duty upon them, the Court should not entertain a private right of action for violation of that duty because Congress did not explicitly create such a cause of action and the area of public utility regulation is traditionally left to state law. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 1301–04, 51 L.Ed.2d 480 (1977); *Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 97 S.Ct. 926, 947–49, 51 L.Ed.2d 124 (1977); *Cort v. Ash*, 422 U.S. 66, 78–85, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). In view of the Court's decision, this issue need not be decided.

**100.** I.R.C. § 4252(d).

**101.** H.Rep. at 1677; S.Rep. at 1726. This section of the committee reports is quoted more fully *supra* pp. 1110–1111.

**102.** *Cf. Hughes v. United States*, 342 U.S. 353, 356, 72 S.Ct. 306, 96 L.Ed. 394 (1952).

**103.** Public Papers, Lyndon B. Johnson, 1965 Vol. 2, No. 326. *See also* 111 Cong.Rec. 12330 (1965) (remarks of Rep. Pucinski); 111 Cong.

Rec. 13624–25, 14073 (1965) (remarks of Sen. Long).

**104.** *Compare* H.Rep. at 1677; S.Rep. at 1726 *with* H.Rep. at 1676; S.Rep. at 1724–25.

**105.** 111 Cong.Rec. 13624 (1965) (remarks of Sen. Nelson). The statement in text came during debate of an amendment, proposed by Senator Nelson, which would have required the Council of Economic Advisers to report annually to Congress on the economic effects of the excise tax reductions, and in particular whether the benefits were being passed through to consumers. Senator Nelson stated that his amendment, which was passed by the Senate but dropped in conference on the ground that the Council already intended to make such a study, *see* 111 Cong.Rec. 14072–73 (1965), was offered because the Act did not prevent any person from retaining for himself the benefits of the tax, and to ensure that Congress found out if that occurred. Senator Long, supporting the amendment, referred specifically to the telephone tax repeal, and the possibility that the

Plaintiffs contend, however, that the Court must judicially imply such a duty from the Act to avoid "an impermissible, standardless delegation of Congressional taxing power to defendants." They claim that by virtue of the defendants' multiple roles in connection with the Act—as lobbyists, beneficiaries of the Act, providers of telephone service, and statutory collecting agents—defendants had, in effect, plenary discretion to decide whether or not the excise tax would be imposed upon Centrex service, by their decision whether or not to establish separate charges for exchange access and intercommunication. Such uncontrolled discretion, plaintiffs argue, would constitute a standardless delegation of the Congressional power to "lay and collect Taxes, Duties, Imposts and Excises." [106] Plaintiffs contend that such a delegation of the Congressional taxing power might raise serious constitutional questions [107] and therefore urge the Court to construe the Act as imposing a duty upon the defendants to act reasonably in establishing separate charges. [108]

However, plaintiffs' major premise is erroneous. There has been no delegation of the Congressional power to tax. That power comprehends the determination of what transactions, facilities or services will be taxed and at what rate. [109] Congress has fully exercised that power here. It has provided that, while other types of telephone service are taxed, private communication service for which a separate charge is made shall be exempt from tax. The fact that, in a given case, a separate charge may or may not be made does not constitute an unconstitutional delegation of Congressional power. It merely determines whether or not the duly enacted tax applies in each instance. [110] As the Court of Appeals for the Ninth Circuit said in a case in which a similar claim was made:

> The Internal Revenue Code imposed federal taxes, as it had a right to do. The [California Public Utilities] Commission fixed the telephone rates, as it had a right to do. The Commission's rates had nothing to do with the federal tax and the federal tax had nothing to do with fixing the rates, but was on them as fixed. [111]

There are numerous instances in the Internal Revenue Code where the application of a particular tax depends on the way a transaction is structured or upon choices made by the parties thereto; [112] the Code does not prescribe the form such transac-

---

benefits of that repeal would not be passed on to consumers, thus indicating a belief that even to the extent it was intended to benefit consumers the Act did not impose any duty on telephone companies. 111 Cong.Rec. 13624–25 (1965).

**106.** U.S.Const., Art. I, § 8.

**107.** *See National Cable Television Ass'n v. United States,* 415 U.S. 336, 340–42, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974); *cf. A.L.A. Schechter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); *Panama Ref. Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935); *J. W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (1928).

**108.** *See National Cable Television Ass'n v. United States,* 415 U.S. 336, 342, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974); *United States v. Thirty-Seven Photographs,* 402 U.S. 363, 369, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971); *Lynch v. Overholser,* 369 U.S. 705, 710–11, 82 S.Ct. 1063, 8 L.Ed.2d 211 (1962); *International Ass'n of Machinists v. Street,* 367 U.S. 740, 749–50, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); *Ashwander v.*

*Tennessee Valley Auth.,* 297 U.S. 288, 347–48, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Crowell v. Benson,* 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932); *cf. Steele v. Louisville & N. R.R.,* 323 U.S. 192, 198–99, 65 S.Ct. 226, 89 L.Ed. 173 (1944).

**109.** *Cf. Helvering v. Stuart,* 317 U.S. 154, 162, 63 S.Ct. 140, 87 L.Ed. 154 (1942); *Morgan v. Commissioner of Internal Revenue,* 309 U.S. 78, 80–81, 60 S.Ct. 424, 84 L.Ed. 585 (1940); *Flint v. Stone Tracy Co.,* 220 U.S. 107, 167, 31 S.Ct. 342, 55 L.Ed. 389 (1911).

**110.** *Helvering v. Lerner Stores Corp.,* 314 U.S. 463, 466–48, 62 S.Ct. 341, 86 L.Ed. 343 (1941); *see Rochester Gas & Elec. Corp. v. McGowan,* 115 F.2d 953, 955 (2d Cir. 1940); *cf. J. W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 407, 48 S.Ct. 348, 72 L.Ed. 624 (1928).

**111.** *Carrigan v. Sunland-Tujunga Tel. Co.,* 263 F.2d 568, 571 (9th Cir.), *cert. denied,* 359 U.S. 975, 79 S.Ct. 893, 3 L.Ed.2d 841 (1959).

**112.** For example, under I.R.C. § 368 the precise form taken by a corporate reorganization can affect its taxability. Under I.R.C. § 152(c) tax-

tions must take but merely taxes them as they are carried out by the parties. To hold that this constitutes an unconstitutional delegation of the taxing power would virtually require Congress to legislate specially the taxability of each transaction, so as to eliminate the ability of the parties to affect the application of the tax. Similarly, the application of the Internal Revenue Code may depend upon the incidents of property created by state law,[113] but that does not constitute an abdication of Congressional authority.[114]

Plaintiffs recognize the general rule but urge that a different result should be reached here because of the defendants' "multiple and overlapping roles." Their arguments have no force. Plaintiffs refer to the defendants' duties of fairness and non-discrimination under federal [115] and state [116] law; however, they have presented no proof that the defendants have violated the statutes to which they refer. They rely

upon the fact that defendants, as statutory collecting agents, computed and collected the tax; but they do not claim that the tax was in any respect incorrectly computed or collected. Finally, they claim that, in light of the defendants' lobbying activities, the Act should be considered similar to a "private bill" and construed strictly against the defendants.[117] However, the Act was not a "private bill" but a revenue enactment of general application.[118] Lobbying in connection with taxation bills is by no means uncommon; the fact that a person has been a leader of a lobbying group in a matter of public importance should not subject the lobbyist to a judicially created fiduciary duty of uncertain scope when Congress has not created such a duty.[119] In sum, the Act imposed no duty upon the defendants to establish separate charges for exchange access and intercommunication.[120]

Accordingly, the complaint is dismissed in its entirety upon the merits.[121] The forego-

---

payers can choose which of them will claim an individual they jointly support as a dependent, if certain conditions are met. *See generally Helvering v. Lerner Stores Corp.,* 314 U.S. 463, 468, 62 S.Ct. 341, 86 L.Ed. 343 (1941).

**113.** *See, e. g., United States v. Mitchell,* 403 U.S. 190, 197, 91 S.Ct. 1763, 29 L.Ed.2d 406 (1971); *Morgan v. Commissioner of Internal Revenue,* 309 U.S. 78, 60 S.Ct. 424, 84 L.Ed. 585 (1940); *Blair v. Commissioner of Internal Revenue,* 300 U.S. 5, 9–10, 57 S.Ct. 330, 81 L.Ed. 465 (1937).

**114.** *Phillips v. Commissioner of Internal Revenue,* 283 U.S. 589, 602, 51 S.Ct. 608, 75 L.Ed. 1289 (1931).

**115.** 47 U.S.C. §§ 201, 202, quoted *supra* n. 97. The parties have stipulated that Centrex charges are not subject to federal regulation. *See* 47 U.S.C. §§ 152(b), 221(b).

**116.** *E. g.,* Cal.Pub.Util.Code §§ 451, 453 (West 1975); Fla.Stat.Ann. §§ 364.03, 364.08, 364.09, 364.10 (West 1968); Ill.Rev.Stat. ch. 111⅔, §§ 32, 37, 38, 39 (1973); Mass.Ann.Laws ch. 159, §§ 14, 17, ch. 166, § 14 (Michie/Law.Coop.1970); N.Y.Pub.Serv.L. §§ 91, 92 (McKinney 1955 & Supp.1976); Ohio Rev.Code Ann. §§ 4905.22, 4905.33, 4905.34, 4905.35, 4909.18 (Page 1977).

**117.** *See United States v. Goltra,* 312 U.S. 203, 210–11, 61 S.Ct. 487, 85 L.Ed. 776 (1941); *Blair v. City of Chicago,* 201 U.S. 400, 471, 26 S.Ct. 427, 50 L.Ed. 801 (1906).

**118.** *Cf. Garner v. Teamsters Local 776,* 346 U.S. 485, 494, 74 S.Ct. 161, 98 L.Ed. 228 (1953).

**119.** Indeed to hold that lobbying could create a fiduciary duty might burden the exercise of fundamental constitutional rights. *Cf. Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).

**120.** The identical claim was rejected in *McDonnell-Douglas Corp. v. General Telephone Co. of Calif.,* No. 74–378–F (C.D.Cal. July 7, 1975).

**121.** Thus, the Court need not consider a final defense raised by nineteen of the operating companies which are not incorporated in New York State and do not provide telephone service there. They contend that venue is improper in the Southern District of New York because they are neither found nor transacting business in this district, despite the fact that each was party to at least one contract with New York contacts, received goods shipped from New York, and had officers or employees in New York from two to eight days each month during the relevant period. 15 U.S.C. § 22. *See United States v. Scophony Corp. of America,* 333 U.S. 795, 807, 68 S.Ct. 855, 92 L.Ed. 1091 (1948); *In re Chicken Antitrust Litigation,* 407 F.Supp. 1285, 1291–92 (N.D.Ga. 1975); *Abrams v. Bendix Home Appliances, Inc.,* 96 F.Supp. 3, 5 (S.D.N.Y.1951).

ing, together with the facts stipulated in the pretrial order, shall constitute the Court's Findings of Fact and Conclusions of Law.